UNITED STATES of America, Appellee,

v.

**Kim Randolph LUCAS, Appellant.**

UNITED STATES of America, Appellee,

v.

**Keith TYLER, Appellant.**

UNITED STATES of America, Appellee,

v.

**Larry TYLER, Appellant.**

UNITED STATES of America, Appellee,

v.

**Bahiya Hiba SHAKUR, a/k/a Joyce Tyler, Appellant.**

UNITED STATES of America, Appellee,

v.

**Abdul Nur SHAKUR, a/k/a Herman Tyler, Jr., Appellant.**

UNITED STATES of America, Appellee,

v.

**Terry L. TYLER, a/k/a Jamal H. Shakur, Appellant.**

Nos. 90–1197, 90–1229 through 90–1231, 90–1445, 90–1866.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1990.

Decided April 26, 1991.

Rehearing and Rehearing En Banc Denied in No. 90–1230 June 21, 1991.

Rehearing and Rehearing En Banc Denied in No. 90–1231 June 24, 1991.

---

**2.** The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

Susan Hunt, Kansas City, Mo., for Abdul Shakur.

Robert Best, Jr., Kansas City, Mo., for Larry Tyler.

Charles Atwell, Kansas City, Mo., for Bahiya Shakur.

Chris Harlan, Kansas City, Mo., for Keith Tyler.

Bruce Houdek, Kansas City, Mo., for Kim Lucas.

Claudia York, Kansas City, Mo., for Terry Tyler.

Kathryn Geller, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and HANSON,* Senior District Judge.

BOWMAN, Circuit Judge.

This is yet another case involving illegal drug activity in Kansas City, Missouri. The appeal is from the judgment of the District Court[1] convicting and its order sentencing defendants Abdul Nur Shakur,

---

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The Honorable D. Brook Bartlett, United States District Judge, Western District of Missouri.

Bahiya Hiba Shakur, Jamal H. Shakur,[2] Kim Randolph Lucas, Larry Tyler, and Keith Tyler. Jurisdiction is based upon 28 U.S.C. § 1291 (1988) and 18 U.S.C. § 3742 (1988). Defendants were tried by jury on a twenty-one count indictment. The indictment charged the defendants with conspiring to distribute cocaine and cocaine base (crack cocaine) in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982) (count I), distributing, and possessing with intent to distribute, crack in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A–C) (1982) and 18 U.S.C. § 2 (1982) (counts II–VII, IX, X, and XIII), using a firearm in relation to drug trafficking, in violation of 18 U.S.C. §§ 2 and 924(c) (1982 & Supp. V 1987) (counts VIII, XI, XII, and XIV), possession of an unregistered firearm in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Supp. V 1987) (count XV), possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) (Supp. V 1987) (count XVI), laundering money in violation of 18 U.S.C. §§ 2 and 1956(a)(1)(B)(i), (C) (1982 & Supp. V 1987) (counts XVII, XIX, and XXI), and structuring cash transactions in order to avoid reporting requirements, in violation of 31 U.S.C. §§ 5322(b), 5324(3) (Supp. V 1987), and 18 U.S.C. § 2 (counts XVIII and XX). Abdul Shakur was named in every count in the indictment. His wife Bahiya Shakur was named in counts I, X, XII, XVII through XIX, and XXI. The remaining defendants all were charged in count I, and in addition, Larry and Keith Tyler were charged in count VIII, Jamal Shakur was charged in count XIX, and Kim Lucas was charged in counts XIX and XX.

At the conclusion of the nine-week trial, the jury deliberated for twelve hours and found the defendants guilty on all counts. Judgment was entered accordingly. The trial court sentenced Abdul Shakur to a prison term of seventy-five years, Bahiya Shakur to 211 months, Keith Tyler to 331 months, Larry Tyler to 195 months, Jamal Shakur to 200 months, and Kim Lucas to 262 months. All defendants also were sen-

tenced to terms of supervised release, each was charged a special assessment, and Jamal Shakur was fined. Finally, Abdul Shakur, Keith Tyler, and Larry Tyler were ordered to pay restitution to Edward G. Robinson, who was shot, beaten, and burned during the course of the conspiracy.

On appeal all the defendants challenge their sentences and convictions, raising numerous arguments. Only the following merit discussion: (1) Abdul and Bahiya Shakur argue that their fourth amendment rights were violated by the trial court's refusal to exclude from evidence two tape-recorded conversations; (2) Except for Keith Tyler, all the defendants argue that the trial court violated their right to a public trial by permitting Detective Mary Brown to testify behind a partial screen; (3) Abdul and Bahiya Shakur, Larry Tyler, and Kim Lucas argue that their right to a fair trial was violated by the trial court's refusal to exclude from evidence testimony and records of telephone calls between Kansas City and Miami; (4) Abdul, Bahiya, and Jamal Shakur, and Kim Lucas argue that the trial court erred by refusing to dismiss the money laundering counts for failure to state an offense; (5) Abdul Shakur and Keith and Larry Tyler argue that the trial court improperly instructed the jury on the *Pinkerton* theory of co-conspirator liability; (6) Keith and Larry Tyler argue that the trial court violated their right to be convicted only upon a unanimous verdict of the jury by submitting count VIII to the jury on the alternative theories of vicarious liability and liability as an aider and abettor; (7) Abdul Shakur challenges his consecutive sentences on counts XI and XII on the grounds that these consecutive sentences violate his right to be free from double jeopardy; (8) Bahiya Shakur argues there is insufficient evidence to support her conviction on the firearm charge in count XII; and (9) Abdul Shakur challenges his sentences on counts II, III, IV, and XIII as having been enhanced without the notice required by 21

---

**2.** Abdul Shakur, Bahiya Shakur, and Jamal Shakur were formerly named Herman Tyler, Joyce Tyler, and Terry Tyler, respectively.

U.S.C. § 851 (1982). For the reasons that follow, we affirm on all grounds with the exception of Abdul Shakur's sentences on counts II, III, IV, and XIII. We vacate those sentences and remand for resentencing on those counts.[3]

## I.

In the early part of 1988 the government, suspecting that Abdul Shakur was involved in narcotics trafficking, began investigating his activities.[4] The investigation focused initially upon the gathering of documents related to Shakur's financial and business transactions. It then was discovered that Shakur owned a shoe shine parlor at 4448 Troost, and that early in 1987 that same location became the address for Squire Park General Contractors (Squire Park), a company formed by Abdul Shakur and Charles Gates.[5] It also was discovered that Abdul Shakur and his wife Bahiya previously had formed an investment corporation called Business People, Inc., which early in 1987 purchased a $60,000 parcel of land at 1330 Brush Creek. The Shakurs' payments for this land consisted of a $5,000 down payment and, later, a $55,000 lump sum payment composed of fourteen cashiers checks, purchased in cash or drawn against accounts opened with cash,

from seven different banks.[6] In addition, the investigators found that the majority of Squire Park's business consisted of the construction of a shopping mall, called the Manheim Project, at the 1330 Brush Creek location.[7] The investigation revealed that Squire Park's expenditures on this project exceeded by a wide margin the amount of Squire Park's legitimate revenues.

In July 1988, Dwight Ward contacted the Kansas City, Missouri Police Department, stating that he had information concerning Abdul Shakur's involvement in narcotics distribution. He told the police that he had worked for Shakur at the shoe shine parlor until May 1987, at which time he began working for Squire Park; that every Friday until May 1987 he purchased crack from Shakur at a house at 4111 East 26th Street; that after he began working for Squire Park he received two "rocks" of crack as part of his pay each week; that Abdul Shakur later moved his drug operation to an apartment located at 1301 East Armour; and that Kim Lucas and Jamal Shakur were present at both the 26th Street house and the East Armour apartment during narcotics sales. Ward also assisted the police by introducing undercover officer Don Birdwell to Abdul Shakur, which ultimately resulted in the officer's making five purchases of crack from Abdul

---

**3.** The issues presented, but rejected by this panel and found not to merit discussion, are: (1) whether a new trial was required because of allegedly improper questioning of Jamal Shakur; (2) whether counts XVIII through XXI are duplicitous; (3) whether the financial transactions implicated in counts XVII, XIX, and XXI satisfy the definition of financial transactions in 18 U.S.C. § 1956(c)(4); (4) whether the evidence was sufficient to avoid dismissal of, and support convictions on, counts I, VIII, X, XVII, XIX, and XXI; (5) whether counts XI and XII are multiplicitous; (6) whether the search of the Shakurs' residence was based upon a valid warrant or upon good faith reliance upon a warrant; (7) whether instructions 53 and 59 were too broad; (8) whether the trial court abused its discretion in denying the motions for severance; (9) whether application of the sentencing guidelines violated each of the defendants' rights to due process of law; (10) whether the trial court erred in not departing downward during sentencing in light of the mitigating factors relevant to some defendants, and in light of the minor role played by other defendants; (11) whether the trial court should have sentenced

the defendants based upon the total quantity of drugs; (12) whether trial counsel was ineffective as a result of failing to pay her bar fees; (13) whether it was proper to depart upward from the guidelines to account for use of a gun when that gun use was the basis of a separate count as well; and (14) whether it was error to increase the base offense level of Kim Lucas for the use of a gun.

**4.** The investigation involved agents of the Internal Revenue Service as well as members of the Kansas City, Missouri Police Department.

**5.** Charles Gates was not named in the indictment nor did he testify at trial.

**6.** At that time Abdul Shakur's shoe shine parlor was generating slightly more than ten dollars per day in revenue, and Bahiya Shakur was working as a data processor for AT & T.

**7.** One of the shops in the Manheim Project was to be a dress store called "Bahiya's," owned by Bahiya Shakur.

Shakur. During all five of these transactions the conversations between Birdwell and Abdul Shakur were recorded.[8]

Armed with the foregoing information, the government obtained warrants to search both of the residences in which the drug sales occurred (4111 East 26th Street and 1301 East Armour), Abdul Shakur's personal residence (1217 East Armour), and the office of Squire Park (4448 Troost). These warrants were executed simultaneously on September 21, 1988.

The search of the residences at 4111 East 26th Street and 1301 East Armour disclosed crack as well as numerous documents and receipts bearing the names of Abdul Shakur, Keith Tyler, and Jamal Shakur. In addition, a firearm was discovered at the 1301 East Armour apartment. The search of the Shakur residence led to the discovery of over $25,000 in cash, a crack laboratory in the basement, over 700 grams of crack, over 30 grams of cocaine, records of drug sales, an automatic pistol and thirteen other firearms, utility and cable bills for the East 26th Street and 1301 East Armour drug houses, and a telephone answering machine tape with approximately 45 calls recorded upon it. Finally, the search of the Squire Park offices revealed numerous documents and records the government found useful in presenting its case.

On October 24, 1988, a federal grand jury returned the aforementioned indictment, and the defendants' trial began April 3, 1989. At trial the government produced, *inter alia,* evidence establishing the facts previously described. From the answering machine tape the court admitted, over objection, two conversations between Abdul and Bahiya Shakur relating to the operation of the charged drug conspiracy. The court also admitted, over objection, evidence of telephone conversations between the Shakurs' residence and a number in Miami, between the two drug houses and the same number in Miami, and between the office of Squire Park and the same number in Miami. The Miami telephone number was listed in the name of Luis Martinez, who was not named in the indictment.

The government also produced Edward G. Robinson as a witness. He testified that Keith Tyler had accused him of stealing drugs, money, and a gun, and that he then was bound and gagged, beaten into unconsciousness, doused with gasoline and set on fire, beaten again, and finally shot in the chest. He further testified that both Keith and Larry Tyler were involved in this series of assaults, as were at least three other unindicted co-conspirators, and that shortly before the shooting Keith Tyler took Robinson's identification and his new tennis shoes, saying that Robinson would not need them any more.

Based upon the testimony of the government's witnesses, the hundreds of pages of financial documents and business records, and the physical evidence seized pursuant to the search warrants, the jury returned guilty verdicts against all defendants on all counts, and the defendants appeal.

## II.

■ Abdul and Bahiya Shakur initially raise several arguments challenging the admission into evidence of two conversations recorded on the tape in their answering machine. Only one merits discussion, and that is the argument that seizure of the answering machine and its tape exceeded the scope of the search warrant.[9] The relevant portion of the warrant in question provided for the search and seizure of "[b]ooks, records, receipts, notes, ledgers and other papers relating specifically to the transportation, ordering, purchase and distribution of controlled substances...." Abdul Shakur's Brief at A–16. The Shakurs insist that the warrant did not support the search or seizure of the answering machine or its tape since it does not mention specifically that it covers these items. The government interprets the warrant more

---

8. By means of another informant, two other undercover officers also were able to make purchases of cocaine base from Abdul Shakur.

9. The Shakurs' argument that the government needed a second search warrant to listen to the tape is meritless, as we find the search and the seizure of the tape proper under the warrant.

broadly, arguing that the paragraph relating to the seizure of records refers to the "generic class of records" and that, consequently, the warrant "is sufficiently particular to include cassette tapes." Government's Brief at 109. We agree with the government.

In *United States v. Gomez–Soto*, 723 F.2d 649, 654–55 (9th Cir.), *cert. denied* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984), the Ninth Circuit faced exactly the same question with regard to the seizure of a microcassette and a locked briefcase. The seizures, as well as the "searches" of both containers, were effected pursuant to a warrant, which like the warrant in this case did not specifically refer to the items searched although it did contain a paragraph, similar to the one implicated here, which provided for the search for, and seizure of, records. *Gomez–Soto*, 723 F.2d at 651–52 n. **. In upholding the admission of evidence obtained by listening to the microcassette and searching the briefcase, the court stated that,

> [i]t is axiomatic that if a warrant sufficiently describes the premises to be searched, this will justify a search of personal effects therein belonging to the person occupying the premises if those effects might contain the items described in the warrant.
>
> The briefcase would be a logical container for any of the many things specifically described in the warrant. A microcassette is by its very nature a device for recording information in general whether it be statistical information, conversations, past events, future plans, all of which come clearly within the specific authority of the warrant. The failure of the warrant to anticipate the precise container in which the material sought might be found is not fatal.

*Gomez–Soto*, 723 F.2d at 654–55 (citations omitted). We find this reasoning persuasive here. We therefore hold that the

District Court's admission of the tape recorded conversations into evidence was proper.[10]

## III.

■ All the defendants except Keith Tyler also argue that the District Court violated their rights to a public trial and to confront the witnesses against them by permitting Detective Mary Brown to testify from behind a screen, so that she could not be seen by the members of the public who were in the courtroom to watch the trial. Only the public trial argument merits discussion.

At trial, the government sought to protect Detective Brown's identity, arguing that use of a screen was necessary to protect her personal safety and to avoid jeopardizing the extensive drug investigations in which she was involved at the time of the trial. The government supported its request with testimony from Captain David Barton of the Drug Enforcement Unit of the Kansas City Police Department's Special Investigations Division. He testified that Detective Brown was one of only a small number of black female detectives in the Division, and that at the time of trial she was involved in "very extensive [drug] investigations ... of major importance to the community," Transcript III at 186; that undercover officers' lives are jeopardized if their identities are revealed; and that within the month prior to trial a friend of Detective Brown's family and two other confidential informants had notified Captain Barton's office that attempts were being made to identify Detective Brown and to determine when she was going to testify. In addition, he testified that his department had received a number of offers from people volunteering to be informants, but only if they could work with black female undercover officers. He interpreted these to be attempts to identify the small number

---

10. We reject the Shakurs' argument that such a conclusion is inconsistent with our decision in *United States v. Strand*, 761 F.2d 449, 452–453 (8th Cir.1985). The issue there was whether a search warrant that permitted a search for stolen mail also permitted the seizure of ordinary household items that might be articles stolen out of the mail. *Strand* does not address the issue of whether a container within the house could be searched if it reasonably might contain items specified in the warrant.

of black female undercover officers in his Division.

Based upon this testimony, and after hearing extensive arguments by the various counsel,[11] the court found that Detective Brown was, at the time of trial, involved in unrelated narcotics investigations and that if her identity was revealed her life would be in danger. It also found that people "engaged in unlawful activity in the Kansas City area" might attempt to use the Shakur trial to identify Detective Brown, Transcript III at 196, who was one of a very small number of black female undercover officers in the Kansas City Police force. Consequently, it concluded that the government had established two "overriding interest[s]" likely to be prejudiced if Detective Brown's identity was not concealed: the ability of the police to conduct effectively law enforcement operations, and the physical welfare of the officers involved. It then considered the use of a disguise, the use of a screen, and full closure of the courtroom as means of concealing her identity. It concluded that, in order most effectively to protect Detective Brown as well as the right to a public trial and the right to confrontation, a screen should be used during her testimony in such a way as to permit spectators to hear but not see her, while not interfering with the ability of the defendants, the court, or the jury to see her when she testified.

We review the District Court's ruling under the abuse of discretion standard. *United States v. Rios Ruiz*, 579 F.2d 670, 674 (1st Cir.1978); *United States v. Eisner*, 533 F.2d 987, 994 (6th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976). The defendants argue that the record is insufficient to support the District Court's ruling because Captain Barton did not communicate directly with the informants and because he had not received any threats against Detective Brown's life. Although we agree that these are considerations relevant to the question of whether the screen should have been used, they are

by no means dispositive. Considering the record before the District Court, we find no abuse of discretion in its conclusion that a screen should be used during Detective Brown's testimony.

## IV.

■ Abdul Shakur, Bahiya Shakur, Kim Lucas, and Larry Tyler all challenge the trial court's decision to admit into evidence records of long-distance telephone calls made to and received from the telephone number in Miami. They insist that, for a variety of reasons, these records were not relevant to the proceedings or, even if they were, that their probative value was substantially outweighed by the unfair prejudice they engendered. *See generally Fed. R.Evid.* 401 & 403. We disagree.

It is well settled that "[t]he trial court has broad discretion in determining the relevancy and admissibility of evidence," *United States v. Wallace*, 722 F.2d 415, 416 (8th Cir.1983) (citations omitted), which will be disturbed upon appeal only where there is abuse of that discretion. *See Wallace*, 722 F.2d at 416–17 (upholding admission of testimony over relevancy objection since no abuse of discretion). Likewise, the trial court's determination that the danger of unfair prejudice does not substantially outweigh the probative value of the evidence is entitled to "great deference," and "will not be reversed 'absent a clear prejudicial abuse of discretion.'" *United States v. Abodeely*, 801 F.2d 1020, 1025–26 (8th Cir.1986) (quoting *Wade v. Haynes*, 663 F.2d 778, 783 (8th Cir.1981), *aff'd sub nom., Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).

The defendants would have us examine the relevance of these telephone records in a vacuum, ignoring the wealth of evidence in the trial record supportive of the District Court's ruling. This we decline to do. *See United States v. Marks*, 816 F.2d 1207, 1212 (7th Cir.1987) ("the probative value of

---

**11.** The argument focused upon whether the evidence was sufficient to support the conclusion that Detective Brown's life would be in danger if a screen was not used and, if it was, whether a disguise should be used instead of the screen, or whether it possibly would be better just to close the courtroom entirely.

evidence often depends upon its being part of a mosaic"). Here there is ample evidence which, together with these phone records, tends to link the conspiracy to Miami. For example, Detective Birdwell testified that Abdul Shakur had said his drug source was in Miami; Kim Lucas made a cash purchase for Shakur of a same-day, one-way airline ticket to Miami; and Shakur's address book included the Miami telephone number involved in these calls. All this, in addition to the large number of calls to and from this number, considered with the fact that they all were made to or received at the residences of four of the defendants, one of the defendants' businesses, and two drug houses linked to the defendants, lends support to the District Court's determination that the records were relevant. We see no abuse of discretion in either the District Court's ruling on the relevancy of these records or its related determination that the probative value of this evidence was not outweighed by the danger of unfair prejudice.

### V.

Abdul Shakur, Bahiya Shakur, Jamal Shakur, and Kim Lucas argue that all of the money laundering charges in counts XVII, XIX, and XXI fail to state an offense in that they fail to allege any nexus between the defendants conduct and interstate commerce. They maintain that such an allegation is essential to a charge of money laundering under 18 U.S.C. § 1956, as it is only by virtue of the commerce clause that Congress may make such conduct criminal. They further contend that because these charges fail to refer to interstate commerce, they therefore omit an essential element of the crimes charged, and consequently are fatally defective. *See United States v. Mallen*, 843 F.2d 1096, 1102 (8th Cir.), *cert. denied*, 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988) ("An indictment is fatally insufficient when an essential element 'of substance' is omitted ...."). We find this argument unpersuasive.

■ Initially we note that the defendants did not make this challenge to the indictment until after the close of the government's case-in-chief,[12] and after jeopardy had attached. *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569, 97 S.Ct. 1349, 1353, 51 L.Ed.2d 642 (1977) ("jeopardy attaches when a jury is empaneled and sworn"). Although a defendant may raise at any time the argument that the indictment fails to state an offense, *see United States v. Clark*, 646 F.2d 1259, 1262 (8th Cir.1981), "indictments which are tardily challenged are liberally construed in favor of validity." *United States v. Pheaster*, 544 F.2d 353, 361 (9th Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). Furthermore, we have held that "[w]here the sufficiency of the indictment is questioned for the first time on appeal, it will be found sufficient unless so defective that by no reasonable construction can it be said to charge the offense for which the defendants were convicted." *United States v. Czeck*, 671 F.2d 1195, 1197 (8th Cir.1982). Although Kim Lucas did raise this issue with respect to count XIX following the close of the government's evidence, we can see no reason to apply a different standard here. Jeopardy still had attached by the

---

12. The defendants state that they "challenged the sufficiency of the money laundering counts by pre-trial motion," which deceptively implies that they raised this "nexus with interstate commerce" argument prior to the start of the trial. *See* Abdul Shakur's Brief at 62. This simply is not the case.

While the defendants did make pre-trial motions to dismiss for failure to state an offense, these motions addressed only counts XIX and XXI, and were based only upon the arguments that the indictment was duplicitous, did not sufficiently inform the defendants of the charges against them, and exposed the defen-

dants to double jeopardy. *See* Designated Record on Appeal, 147–55, 162–69, 197–205, 300–04 (Motions by Bahiya Shakur, Jamal Shakur, and Kim Lucas). In addition, Abdul Shakur made a generic motion to dismiss the entire indictment. *See* Designated Record on Appeal at 235–42.

The first and only motion prior to the close of all the evidence which raised the "nexus with interstate commerce" argument was made by Kim Lucas, who raised this argument only with respect to count XIX, and only after the government had completed its case-in-chief. *See* Designated Record on Appeal at 908.

time she made her argument, the government and the court already had committed a great deal of resources towards the trial of this case, and the defendants do not even maintain the pretense that they were prejudiced in preparing their defenses. Therefore, we will find these counts sufficient unless they are so defective that "by no reasonable construction can [they] be said to charge the offense[s] for which the defendants were convicted." *Czeck*, 671 F.2d at 1197.

■ We find that counts XVII, XIX, and XXI, reasonably construed, do allege a nexus with interstate commerce. We therefore do not reach the question of whether an allegation of a "nexus with interstate commerce" is an essential element in a charge under 18 U.S.C. § 1956 for laundering money. All three counts refer to specific acts of money laundering that gave rise to the charges in each of those counts. Counts XIX and XXI refer to conduct that is related expressly to the construction of a shopping mall at 1330 Brush Creek in Kansas City, Missouri. Likewise, count XVII refers to the purchase of the real estate at 1330 Brush Creek, and although it does not expressly state that it is to be used in the construction of the mall, the inference that it is to be put to such a use is, in the circumstances of this case, quite reasonable.

Furthermore, although counts XVII, XIX, and XXI do not expressly mention the words "interstate commerce," it seems apparent that an effect upon interstate commerce is an inevitable incident of the construction of a shopping mall. Consequently, we believe that allegations that reasonably implicate the construction of a such an establishment are sufficient to constitute allegations of an effect upon interstate commerce. Defendants' attack on the legal sufficiency of counts XVII, XIX, and XXI therefore must fail.

## VI.

Abdul Shakur, Keith Tyler, and Larry Tyler challenge the instructions given to the jury with regard to count VIII. This count charges these defendants with violations of 18 U.S.C. § 924(c) in connection with the torture and shooting of Edward G. Robinson. The jury was instructed that Shakur could be guilty only vicariously for the use of the gun, but that the Tylers could be guilty either vicariously or as aiders and abettors. The instruction given with respect to Keith and Larry Tyler included both theories of liability, which were presented as alternatives. The jury also was given a general unanimity instruction, but no specific instruction was given addressing unanimity as to the alternate theories under which the Tylers could be found guilty of the section 924(c) charge. The defendants raise a number of arguments with regard to these instructions, two of which merit discussion.

## A.

■ First, all three defendants argue that the instructions incorrectly set forth the law of vicarious liability. The relevant portion of each instruction provides that each defendant could be found vicariously liable if he "could reasonably have foreseen that a firearm would be used to assault someone as a necessary or natural consequence of the conspiracy." Addendum to Government's Brief at F–1, F–4, & F–7. The defendants contend that the instructions should have permitted a finding of vicarious liability only where the jury found the defendant could "specifically" foresee the "actual offense committed by [his] co-conspirator." Abdul Shakur's Brief at 69.[13] Each defendant maintains that the relevant portion of his jury instruction was too general with respect to foreseeability, and thus each insists that his conviction under count VIII should be reversed. We find that the challenged instructions correctly set forth the relevant

---

13. Keith and Larry Tyler phrase their argument slightly differently, insisting that they should be found vicariously liable only if the jury found that they could foresee the "specific substantive offense committed" by their co-conspirator. Keith Tyler's Brief at 18; *accord* Larry Tyler's Brief at 17.

law regarding vicarious liability, and we therefore reject the defendants' arguments.

The law on the issue of vicarious liability for crimes committed by one's co-conspirator is set forth in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). We recently have observed that

> [u]nder *Pinkerton*, each member of a conspiracy may be held criminally liable for any substantive crime committed by a co-conspirator in the course and furtherance of the conspiracy, even though those members did not participate in or agree to the specific criminal act.

*United States v. Golter*, 880 F.2d 91, 93 (8th Cir.1989) (citations omitted). As Pinkerton establishes, this type of criminal liability may not be imposed

> if the substantive offense ... was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or ... could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

*Pinkerton*, 328 U.S. at 647–48, 66 S.Ct. at 1184. Here the jury was instructed that it could hold a defendant vicariously liable only if it found that a conspiracy existed, that the defendant was a member of it, that a conspirator used a firearm to assault Robinson, and that the defendant could "reasonably have foreseen" that a firearm would be used to assault someone "as a necessary or natural consequence of the conspiracy." Addendum to Government's Brief at F–1, F–4, and F–7. These instructions fully comply with *Pinkerton's* requirements. We therefore reject the defendant's arguments with regard to the vicarious liability instructions.[14]

### B.

■ The second challenge to these instructions is made by Keith and Larry Tyler who argue that their convictions on count VIII should be reversed since they could have been based upon non-unanimous verdicts. They argue that this could have occurred because both theories—vicarious liability and aider and abetter liability—were presented to the jury in the same jury instruction as alternative grounds for conviction and, although the jury was given a general unanimity instruction, they were not given a specific unanimity instruction for count VIII. At trial, however, neither defendant requested a specific unanimity instruction. *See* Keith Tyler's Brief at 25; Larry Tyler's Brief at 24. The issue therefore has not been preserved for appellate review, and we can reach it only under the plain error doctrine. *See e.g., United States v. Hiland*, 909 F.2d 1114, 1135 (8th Cir.1990) (where defendant neglected to object at trial, appellate review of improper prosecutorial comments is limited to plain error). Under this standard, the failure to give a specific unanimity instruction will be grounds for reversal only if that failure "was 'such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.'" *Hiland*, 909 F.2d at 1135–36 (quoting *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985)). Defendants' showing falls short of this exacting standard.

In general, "[t]he mere fact ... that an instruction could conceivably permit a jury to reach a non-unanimous verdict is not sufficient to require reversal when the jury has been instructed that it must reach a unanimous verdict." *Fryer v. Nix*, 775 F.2d 979, 992 (8th Cir.1985). Here, although no specific unanimity instructions were given, in both of the Tylers' cases the count VIII instructions clearly distinguish the two different theories of guilt. In both cases they completely instruct on the issue of aider and abetter liability before addressing the issue of vicarious guilt. Furthermore, in both cases the count VIII instructions preface the vicarious guilt portion of the instruction with the phrase, "[i]n the alternative." Addendum to Govern-

---

**14.** We note that *United States v. Alvarez*, 755 F.2d 830 (11th Cir.), *cert. denied*, 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985), the case upon which the defendants most heavily rely, involved a situation in which the substantive crime, which was the subject of *Pinkerton* instructions, was not within the scope of the conspiracy. *Alvarez*, 755 F.2d at 850.

ment's Brief at F–3 to F–7.[15] Considering the language of these instructions along with the fact that the jury was given a general unanimity instruction, we cannot conclude that the District Court's failure to provide *sua sponte* specific unanimity instructions for count VIII " '[undermined] the fundamental fairness of the trial and [contributed] to a miscarriage of justice.' " *Hiland,* 909 F.2d at 1135–36. We therefore reject the Tylers' claims.

## VII.

Abdul Shakur challenges his consecutive sentences under counts XI and XII, arguing that they subject him to double jeopardy in violation of the Fifth Amendment. Both counts charge him with using firearms in relation to the drug trafficking charge in count X—possessing crack with intent to distribute—and both stem from the discovery of firearms found at the Shakur residence during the execution of the search warrant. The District Court found that the firearms charged in count XII were used for a different purpose than the firearm charged in count XI, specifically to protect Shakur, his family, and drug money as opposed to the drug lab and its contents; consequently these counts charge separate offenses under section 924(c), and consecutive sentences are therefore appropriate.

Shakur does not argue that the firearms were not used for different purposes, and he does not challenge the District Court's finding in that regard. Rather, Shakur contends that counts XI and XII both charge him with the same offense because: first, all the firearms in question were possessed simultaneously by him, and simultaneous possession, he reasons, may support only one offense under section 924(c); and second, both counts refer to the same predicate offense, and according to Shakur, any single predicate offense may support only one offense under section 924(c). We are not persuaded.

■ Shakur's first argument, that simultaneous possession of more than one firearm can give rise to only one section 924(c) offense, merits little discussion. Offenses under section 924(c) are defined in terms of using or carrying firearms in relation to a drug trafficking crime or a crime of violence, not in terms of when the firearms were possessed. *See* 18 U.S.C. § 924(c) (1988);[16] *cf., United States v. Jones,* 841 F.2d 1022, 1023–25 (10th Cir. 1988) (addressing statutes which define weapon offenses in terms of "receipt" and "possession"). We can find nothing, in the case law or in the language of section 924(c), that would warrant adoption of the argument Shakur makes here.

---

15. Instruction number 42 provides in part:

You are instructed that Keith Tyler may be found guilty of the crime of using a firearm during and in relation to the drug trafficking offense of conspiracy to distribute crack cocaine ... if he aided and abetted the commission of the crime of using a firearm during the drug trafficking offense.

In order to find Keith Tyler guilty of aiding and abetting the offense of using a firearm during and in relation to a drug trafficking offense, the United States must establish....

In the alternative, under the conditions defined in this instruction, a defendant who has been found guilty of conspiracy may also be found guilty of the offense charged in Count VIII even though he did not participate in the acts constituting that offense....

Therefore, if you find that Keith Tyler is guilty of conspiracy as charged in Count I, you may find Keith Tyler guilty of the offense charged in Count VIII provided you also find....

If the United States has proved beyond a reasonable doubt each of these essential ele-

ments of either aiding and abetting, or of agency liability, you may find the defendant Keith Tyler guilty....

Government's Addendum at F–3 to F–5. Larry Tyler's instruction is similar. *See* Government's Addendum at F–6 to F–8.

16. The current version of section 924(c) is, for all practical purposes, the same as the version of the statute applicable to Shakur. The relevant portion provides:

Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime ... be sentenced to imprisonment for five years, ... and if the firearm is a machine gun, ... or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years.... [T]he term of imprisonment imposed under this subsection [shall not] run concurrently with any other term of imprisonment....

18 U.S.C.A. § 924(c)(1) (1991 Pocket Part).

■ Shakur's second argument is that one predicate offense may give rise to only one section 924(c) offense, regardless of the number of separate firearm uses that relate to that predicate offense. This, too, raises a question of first impression in this circuit. Shakur relies upon cases from the Sixth, Ninth, and Eleventh Circuits that appear to limit to one the number of section 924(c) offenses that may relate to one predicate offense. *See United States v. Nabors*, 901 F.2d 1351, 1357–58 (6th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990); *United States v. Henry*, 878 F.2d 937, 943–44 (6th Cir.1989); *United States v. Fontanilla*, 849 F.2d 1257, 1258–59 (9th Cir.1988); *United States v. Rawlings*, 821 F.2d 1543, 1544 (11th Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987).[17] Upon examination, however, it becomes clear that these cases are inapposite.

In *Nabors*, the Sixth Circuit upheld separate section 924(c) sentences where each section 924(c) charge related to a different predicate offense. *See Nabors*, 901 F.2d at 1357–58. The Ninth and Eleventh Circuits did the same in *Fontanilla* and *Rawlings*.[18] *See Fontanilla*, 849 F.2d at 1259; *Rawlings*, 821 F.2d at 1544. In *Henry* the Sixth Circuit did not permit consecutive section 924(c) sentences where each section 924(c) charge related to the same

predicate offenses and each involved the same use of firearms. *See Henry*, 878 F.2d at 943–44 ("we consider this weapon to bear the same relationship to drug trafficking crimes as did the weapons in the house"). In none of these cases did the courts address, or have the opportunity to address,[19] the question of whether distinct *uses* of firearms likewise can support separate section 924(c) convictions where the uses do not relate to distinct predicate acts.[20] Consequently, these decisions offer little guidance in resolving the issue now before us.

We believe that our consideration of Shakur's argument is governed by the analysis in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). There the Supreme Court considered first, whether two separate drug sales constituted two offenses under the same drug law, and second, whether the second drug sale constituted an offense under each of two drug laws. *Blockburger*, 284 U.S. at 301, 52 S.Ct. at 181. It is the analysis of the first issue that is relevant to our present inquiry.[21]

On that issue, the Court concluded that each sale did constitute a separate offense under the same drug statute, reasoning that:

> [t]he distinction ... is that "when the impulse is single, but one indictment lies

---

**17.** A line of cases from the Tenth Circuit also appears to so limit section 924(c). *See, e.g., United States v. Rodgers*, 921 F.2d 1089, 1092–93 (10th Cir.1990); *United States v. Ross*, 920 F.2d 1530, 1538–39 (10th Cir.1990); *United States v. Henning*, 906 F.2d 1392, 1399 (10th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 789, 112 L.Ed.2d 852 (1991); *see also United States v. Chalan*, 812 F.2d 1302, 1316–17 (10th Cir.1987).

**18.** *Rawlings* did not address the issue directly, but proceeded under an implicit assumption that two sentences under section 924(c) were proper where they related to different predicate acts. *Rawlings*, 821 F.2d at 1544.

**19.** In *Henry*, the Sixth Circuit noted that one of the two section 924(c) charges involved a firearm which "arguably" could have been used by the defendant to "[protect] his person or [to assault] a local police officer." *Henry*, 878 F.2d at 944, n. 6. It declined to consider the effect of these alternate uses, however, since "the former does not implicate section 924(c)(1), and the latter ... was not charged." *Id.* We do not

have the same difficulties here since Shakur's uses of the firearms clearly implicate section 924(c) and, as Shakur himself points out, they both relate to the same predicate offense which was charged in the indictment.

**20.** Furthermore, it appears that *Nabors, Henry*, and *Fontanilla*, as well as the line of cases from the Tenth Circuit, all ultimately trace their holdings on this section 924(c) issue to *United States v. Chalan*, 812 F.2d 1302, 1316–17 (10th Cir. 1987), in which there was only one "use" of a firearm that related to two predicate offenses, and both predicate offenses only constituted one "offense" for purposes of double jeopardy.

**21.** The defendant refers us to the analysis employed to resolve the second *Blockburger* issue. *See* Abdul Shakur's Brief at 74. However, as is set forth above, the Court there is considering whether violations of different statutory provisions constitute separate offenses. Here, we are concerned with whether certain conduct constitutes two violations of the *same* statute.

no matter how long the action may continue. If successive impulses are separately given, even though all unite in swelling a common stream ... separate indictments lie.... The test is whether the individual acts are prohibited, or the course of action which they constitute." *Blockburger*, 284 U.S. at 302, 52 S.Ct. at 181 (quoting Wharton's Criminal Law, 11th ed., § 34 & note 3).

Here the District Court found that the firearms charged in count XII were used to protect Shakur, his family, drug money, and cocaine held for personal use, while the machine gun, which was charged in count XI, was used to protect the crack lab as well as the large inventory of drugs contained therein. *See* Sentencing Transcript for Abdul Shakur at 38–40. As mentioned earlier, Shakur does not challenge these findings.[22] We believe that these separate uses constitute separate "impulses" in the *Blockburger* sense, and therefore that these separate uses properly support separate section 924(c) charges, even though both of the charges relate to the same predicate offense.

■■ Buttressing our holding is the clear design of section 924(c) to deter individual uses of firearms rather that firearm use as a course of action. Section 924(c) seeks "[t]o persuade the man who is tempted to commit a federal felony to leave his gun at home." *Rawlings*, 821 F.2d at 1546 (quoting Representative Poff at 114 Cong. Rec. 22231 (1968)). If section 924(c) were interpreted as subsuming individual firearm uses within an overall course of action involving the use of a firearm, its ability to "persuade" a wrongdoer "to leave his gun at home" would be limited to that group of drug traffickers and violent criminals who never have "used or carried" a firearm in relation to their crime. Such a result would be at odds with the essential purpose of section 924(c). We therefore conclude that each separate use of a firearm in

relation to a violent crime or drug trafficking crime is punishable under section 924(c) regardless of whether other section 924(c) charges are related to the same predicate offense. As here it is undisputed that the machine gun in count XI was used for a separate purpose from the firearms in count XII, we hold that Shakur's convictions under counts XI and XII are for separate offenses, and therefore his consecutive sentences on these counts do not violate the constitutional prohibition against double jeopardy.

## VIII.

■■ Bahiya Shakur argues that her conviction on count XII is unsupported by the evidence. That count charges her, along with Abdul Shakur, with violating 18 U.S.C. § 924(c) by using firearms in relation to the offense of possessing crack with intent to distribute. She contends that the evidence does not support a finding that she "used" the firearms as provided in the statute, and thus her conviction on count XII must be reversed. We disagree.

In *United States v. Matra*, 841 F.2d 837 (8th Cir.1988), we upheld a section 924(c) conviction on similar facts. There the defendant was convicted of possession with intent to distribute cocaine and of the use of a machine gun in relation to that crime. Most of the cocaine supporting the possession charge was found in a hole in a closet floor in a locked upstairs bedroom of a crack house. The machine gun was found in the same room beneath the frame of a waterbed. Matra possessed the key to this room. At the time of his arrest Matra was not in this room, but did have its key on his person. On appeal he argued that he had not "used" the machine gun as required by section 924(c). *Matra*, 841 F.2d at 838–40. We rejected this argument observing that the crack house was a "veritable fortress," [23] and reasoning that:

---

**22.** During sentencing Shakur did challenge the government's arguments regarding the guns' uses as being "speculative." That objection was overruled and Shakur has not raised it on appeal. Sentencing Transcript of Abdul Shakur at 36–38.

**23.** A total of eight weapons, including (in addition to the machine gun) pistols, an assault rifle, and a shotgun were found in the house. *Matra*, 841 F.2d at 839.

[j]ust as weapons are kept at the ready to protect military installations against potential enemy attack, so too may weapons be kept at the ready to protect a drug house, thereby safeguarding and facilitating illegal transactions.

*Matra*, 841 F.2d at 842. Based on this reasoning we concluded that the machine gun "was an integral part of [Matra's] criminal undertaking" and that "it would defy both logic and common sense to conclude that Matra did not 'use' the machine gun within the meaning of section 924(c)." *Matra*, 841 F.2d at 843.

The same reasoning applies in the present case. Two of the firearms listed in count XII were found in a bench seat in the den, near the front door of the Shakurs' residence. The other two were found above the refrigerator in the kitchen, near the back door. A machine gun was located in the part of the basement in which the "crack" was made, and nine other firearms were found throughout the house.[24] Considering that over 730 grams of crack and over $25,000 in cash were found in the house, we believe that the presence of the firearms charged, together with the locations in which they were found, clearly raises a jury question as to whether the firearms were "kept at the ready" to safeguard and facilitate the illegal transactions occurring in the Shakur home.[25]

Bahiya defends by attempting to distinguish her case from *Matra*, pointing out that in *Matra:*

(1) there was evidence to suggest that Matra was directly involved in the distribution of drugs, whereas[ ] there was no such evidence related to Bahiya Shakur; (2) Matra was present at the time of the seizure, Bahiya Shakur was not; (3) there was evidence of ready access to the

weapons due to the key found on *Matra* [sic] dissimilar from that in the case at bar; and (4) unlike *Matra*, in this case there was a co-defendant, Abdul Shakur, who was clearly the driving force behind the direct distribution of narcotics.

Bahiya Shakur's Brief at 9. We find all these distinctions either incorrect or irrelevant. The evidence in this case includes two tape-recorded conversations that do implicate Bahiya Shakur directly with the distribution of drugs, contrary to the assertion in her first point, and she has not told us, not can we discern any reason, why the second and fourth factual distinctions should affect our analysis of her case. The fact is that all these firearms were found in her home, where large amounts of crack were made and where the crack was distributed, and she had ready access to these firearms at all times. We conclude that her section 924(c) conviction is well supported by the evidence.

We find no merit in her related argument that her access to the firearms in the bench seat and above the refrigerator was not comparable to Matra's access to the machine gun, which was under a waterbed frame in a locked room. The distinction she attempts to draw between her case and *Matra* is not necessarily favorable to her, and in any event would not warrant the conclusion that the government's evidence was insufficient to sustain her firearms conviction.

We hold that the evidence is sufficient to support Bahiya Shakur's conviction on the section 924(c) charge set out in count XII.

## IX.

Finally, Abdul Shakur challenges his sentences on counts II, III, IV, and XIII, argu-

---

**24.** These included four rifles in a footlocker in a closet of a room used as an office; a pistol and a revolver in the closet of the northwest bedroom; two revolvers on top of a china cabinet in the dining room; and a rifle in a stairway closet. Addendum to Government's Brief at 430, 35.

**25.** That the evidence does not show *conclusively* that these weapons were related to the predicate drug offense, or that Mrs. Shakur can concoct

scenarios that do not implicate her in the actual use of any of them, is irrelevant. When considering the sufficiency of the evidence to sustain a conviction, we "examine the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences, and [we] can reverse only if we can conclude that a reasonable fact-finder could not have found guilt beyond a reasonable doubt." *Matra*, 841 F.2d at 840.

ing they were enhanced without compliance with the provisions of 21 U.S.C. § 851. This section establishes a procedure the government must follow when seeking an enhanced sentence for a defendant based upon that defendant's prior convictions. *See* 21 U.S.C. § 851(a)(1) (1982). The government concedes this sentencing issue, admitting that it failed to comply with section 851. Government's Brief at 144–45.[26] We therefore vacate the sentences on those counts, and remand those counts for resentencing in compliance with section 851.

## X.

We have considered all the other issues raised by the defendants and find them to be without merit and not warranting discussion.[27] The judgment of the District Court is affirmed in all respects, except as to Abdul Shakur's sentences on counts II, III, IV, and XIII. Those sentences are vacated and remanded for resentencing in compliance with 21 U.S.C. § 851.

---

**26.** This result will not affect Abdul Shakur's 75–year prison term as his 30–year sentences on counts II, III, IV, and XIII are concurrent with one another and were imposed concurrently with his 30 year sentence on count I. *See United States v. Shakur*, No. 88–00208–01–CR–W–9 (W.D.Mo. Filed March 8, 1990) (judgment and sentencing order), *reprinted in* Abdul Shakur's Brief at A–1 to A–9.

**27.** These issues are listed in footnote 3, *supra*.