# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3124

_____

United States of America,      *
    *
       Plaintiff - Appellee,     *
    *   Appeal from the United States
       v.     *   District Court for the
    *   District of Nebraska.
Jeffrey E. Hoover,     *
    *
       Defendant - Appellant.     *

_____

Submitted: March 26, 2008
Filed: September 19, 2008

_____

Before RILEY, JOHN R. GIBSON, and MELLOY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Jeffrey Hoover appeals from his jury conviction on two counts of using a firearm in connection with a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1), resulting in the deaths of Harold Fowler and Duane Johnson. He challenges the sufficiency of the evidence, alleges that the district court[1] erred in two evidentiary rulings, and asserts that a verdict should have been entered on only one count because the counts were redundant. We affirm.

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

On June 14, 1997, Lincoln police were called to Harold Fowler's apartment in response to the building owner's concern about reports of a foul odor and flies coming from the apartment. The decomposing bodies of Harold Fowler and Duane Johnson were found there, both of whom died from multiple gunshot wounds attributable to homicide. The government introduced forensic evidence at trial that the murders had occurred approximately five days before the bodies were found. Although Lincoln police actively investigated the murders, they had no break for eight years that would lead them to consistently focus on any particular person. On July 5, 2005, Sergeant Koziol received a kite, or a message from an inmate, that the inmate wanted to talk to a detective. An investigator first interviewed the inmate, Jeff Hauser, on July 8 and again on September 13. As a result of these conversations, police interviewed Benjamin Waldbaum, B.J. Kempton, and Jeffrey Hoover in connection with the murders of Fowler and Johnson.

Waldbaum was fifteen years old and Kempton was seventeen at the time Fowler and Johnson were killed. Hoover was in his twenties. Kempton lived with his sister and Hoover, who was his sister's boyfriend. Waldbaum, who bought alcohol and marijuana from Fowler, lived two doors away. During their initial investigation, police contacted Waldbaum about two months after the murders and Kempton three and a half months after that. Neither was a suspect, but they were contacted because they knew Fowler. At the time, neither revealed that they had any personal knowledge of the facts surrounding the deaths, and police did not have any further contact with Waldbaum or Kempton until 2005. Police also contacted Hoover within three months of the murders because he had reported some of his checks had been stolen and police found the checks in Fowler's apartment building while they were investigating the murders. Although Hoover did not know it at the time, Waldbaum had stolen the checks and given them to Fowler because Fowler had offered to give Waldbaum alcohol, marijuana, or cigarettes in exchange for any checks he might run across. None of that information came to light in 1997.

When police received the kite in July 2005, they learned that Waldbaum had been talking about witnessing a homicide. From that point, the investigation became quite active and police were able to ascertain the details of Waldbaum's and Kempton's involvement. In the spring of 1997, Waldbaum was at Kempton's house and Hoover was also there. Hoover was complaining that checks totaling $1500 had been forged on his account, and he was looking to buy a pound of marijuana that he could resell to recoup his loss. Waldbaum told Hoover he could get a pound for $900, and he offered to arrange the deal in the hopes that he could be paid a fee in money or marijuana. Waldbaum negotiated the sale with Fowler and told him not to rip off Hoover because the checks Waldbaum had stolen for Fowler belonged to Hoover.

On the morning of June 9, 1997, Waldbaum rode his bike to Fowler's apartment to check on the deal. Fowler and Johnson were there. Although the marijuana was not yet at the apartment, Waldbaum called Kempton and Hoover to come over, and when Hoover arrived Fowler explained that he didn't have the marijuana but would be getting it. Hoover was upset by this news and reluctantly gave Fowler $850 on the promise that Fowler would deliver. Fowler and Johnson left, but Waldbaum, Kempton, and Hoover remained in the apartment. As time passed without Fowler returning, Hoover got increasingly upset. He had Waldbaum page Fowler to see why he was taking so long, and Fowler said he would be back in half an hour. He was not. Hoover placed a phone call to borrow a gun, and he sent Kempton in his car to retrieve it. While Kempton was gone, Hoover began wiping down surfaces he might have touched to remove fingerprints.

Kempton returned to the apartment, and Hoover left briefly to get the gun from the car. He carried a .22 rifle wrapped in a towel into the apartment and placed it beside the couch with a pillow hiding it. After dark, Hoover told Kempton to go move Hoover's car so that it would appear that he had left. Fowler and Johnson arrived around 9:00 or 9:30 p.m. without the marijuana or Hoover's money. Hoover was extremely angry and began to argue with Fowler. Hoover grabbed the gun and

confronted Fowler and Johnson with it in the kitchen area. They continued to argue, and Hoover jabbed the barrel of the gun into Fowler's chest. Waldbaum saw Fowler stumble backward and saw blood trickle from his chest. Hoover told the boys to leave, and they both grabbed their bikes and ran. They threw their bikes over the fence and went to Hoover's car where they waited about five minutes for Hoover to arrive. He was carrying the gun, covered by the towel. Hoover told Waldbaum to get out of the car and to meet him back at Hoover's house. When Waldbaum inquired what had happened, Hoover said the two were dead. After meeting up at Hoover's house, Waldbaum and Kempton went back to Fowler's apartment to lock the door. While there, they retrieved $65 from Fowler's pockets and took Johnson's fanny pack.

The evidence was presented in a nine-day trial during which the government produced thirty witnesses and the defense presented five. The jury returned a verdict of guilty on both counts, and the district court imposed concurrent life sentences on each count. Hoover filed a timely notice of appeal.

I.

Hoover first argues that the evidence was insufficient to support his conviction under 18 U.S.C. § 924(c)(1). His argument is a narrow one. He asserts that an essential element of the crime is using a weapon in relation to a drug trafficking offense, and he contends that the evidence was insufficient to establish that he was trafficking. Hoover points out that he did not possess or deliver any drugs and he contends that evidence of his intended marijuana purchase was too remote in time to the killings to be probative of his intent to distribute. Furthermore, he asserts that a pound of marijuana is not a quantity that creates a permissible inference of an intent to distribute. In determining sufficiency, we view the evidence in the light most favorable to the verdict and we will reverse only where no reasonable jury could have found the defendant guilty beyond a reasonable doubt. United States v.Velazquez, 410 F.3d 1011, 1015 (8th Cir. 2005).

Hoover's argument fails. As the district court instructed the jury, each count contained five essential elements: 1) Hoover knowingly and intentionally attempted to possess with intent to distribute a mixture or substance containing a detectable amount of marijuana; 2) he knowingly used a firearm during and in relation to the crime; 3) he used the firearm to unlawfully kill Fowler and Johnson; 4) he acted with malice aforethought; and 5) the killing was premeditated. The government did not have to prove that Hoover actually possessed or delivered drugs, nor did it have to meet a threshold quantity of the marijuana that he attempted to possess. The evidence showed that Hoover told Waldbaum that he wanted to purchase marijuana so that he could recoup the expense of the forged checks, and the negotiations with Fowler continued through the day he was killed. Hoover gave Fowler $850 for Fowler to buy marijuana for Hoover and he waited at Fowler's apartment for the delivery that never came. Clearly, Hoover's actions were a substantial step toward attempting to possess with intent to distribute marijuana. See United States v. Gaines, 969 F.2d 692, 698-99 (8th Cir. 1992). The jury heard sufficient evidence of Hoover's intent to support his conviction.

## II.

Hoover asserts that the district court erred in admitting prior consistent statements of Waldbaum and Kempton through other witnesses because the statements were unfairly prejudicial and the court's limiting instruction was insufficient to prevent the jury from considering the statements as substantive evidence of Hoover's guilt. We review the district court's evidentiary rulings for abuse of discretion. United States v. Kenyon, 397 F.3d 1071, 1081 (8th Cir. 2005).

Steven McCaul testified at trial. He had been friends with Hoover for a few years before the shootings. Hoover called him in early June 1997 and asked to borrow his rifle, as he had done before. Kempton came to McCaul's apartment to pick it up. McCaul never saw the rifle again, but he did see Hoover that same night. Hoover told

him he had used McCaul's gun to shoot and kill two men to whom he had given money to buy marijuana because he did not get the marijuana or his money back. They spoke again about six months later when Hoover told McCaul that he was nervous about the murders because his checkbook had been found in the apartment building where the men were killed.

The government also elicited testimony from McCaul about his conversation with Kempton about a week after the murders in which Kempton told McCaul that he had been present when Hoover killed the two guys. Outside the jury's presence, the government had offered this testimony as substantive non-hearsay evidence under Federal Rule of Evidence 801(d)(1)(B). The district court had denied the offer and instead announced its intention to admit the testimony with an instruction that limited its use to assessing Kempton's credibility. The court read its proposed limiting instruction, and Hoover's counsel agreed to it. When the government asked McCaul during his testimony what Kempton said to him, Hoover's counsel objected to the evidence as hearsay and as unduly prejudicial, and the district court allowed McCaul to answer before giving the following instruction.

> Ladies and gentlemen, I'm going to give you a limiting instruction now about what Mr. McCaul has testified that Mr. Kempton said to him, allegedly said to him in the summer of 1997. You may use the testimony of Steven McCaul about what Brian Kempton said to him in the summer of 1997 for a limited purpose. You may only use what McCaul said that Kempton said in the summer of 1997 to evaluate the credibility of Brian Kempton. In other words, Kempton's statement to McCaul in the summer of 1997 cannot be used by you to prove that the defendant is guilty of the crime charged. That is, it can be used only to evaluate Kempton's credibility.

The court then inquired of Hoover's counsel if the instruction was sufficient, and counsel replied that it was. The government elicited similar testimony from Jennifer Wilson, Kempton's former girlfriend, and the district court gave the same sort of

limiting instruction before she testified about what Kempton had told her. Finally, Sergeant Koziol testified that Waldbaum told him in an October 2005 conversation that he had been involved in a drug rip-off killing that he and Kempton witnessed and the shooter was Jeff Hoover. Koziol also recounted Waldbaum's similar statements to Jeff Hauser's girlfriend in September 2005 that were secretly recorded via a wire that she wore. The district court instructed the jury that they could use Koziol's testimony only for the purpose of assessing Waldbaum's credibility.

Hoover complains that the statements should have been excluded because they were not offered to rebut an implied or express charge of recent fabrication. He asserts that Kempton's and Waldbaum's admitted presence in Fowler's apartment gave each an immediate motive to lie, and thus their statements were not admissible under Rule 801(d)(1)(B) because they were not made before the motive arose. Hoover correctly states the law to the effect that an earlier consistent statement must have been made prior to the opportunity for fabrication in order to be admissible as non-hearsay. Tome v. United States, 513 U.S. 150, 167 (1995). The government contends that the testimony was admissible because Kempton had testified at trial and was subject to cross-examination, the statements were consistent with that testimony, and the statements were offered to rebut a charge that Kempton later had a motive to lie about Hoover's involvement.

The district court made no determination about when a motive to lie arose for Waldbaum or Kempton. It denied the government's effort to admit the statements under Rule 801 and informed counsel that it intended to allow the testimony with a limiting instruction. Hoover's counsel agreed to the instruction the court proposed. When McCaul and Wilson testified, Hoover's counsel objected on the basis of hearsay and each time the district court gave the instruction. With respect to the statements that came from Koziol, they were elicited during the government's cross-examination in an effort to rehabilitate Waldbaum's testimony with prior consistent statements. Hoover's counsel objected to the questioning as being beyond the scope of Koziol's

direct testimony, but the district court allowed the government to ask about Waldbaum's prior statements to fill in the time-line that Hoover had established through Koziol's direct testimony.

We need not determine whether Waldbaum's and Kempton's statements that are the subject of Hoover's challenge were made before either man had a motive to fabricate. Koziol's testimony contained prior consistent statements that were introduced for the purpose of rehabilitating Waldbaum's testimony. Waldbaum spoke with Hauser's girlfriend in September 2005 and told her that he had witnessed a homicide when he was fourteen years old over a drug deal gone bad involving nine hundred dollars. He and a friend had been there with their bicycles, they were surprised when the shot was fired, and they had returned to the apartment after the killings. The shooter was in his twenties, and the bodies sat in the apartment for about five days before police found them. Koziol then recounted his interview with Waldbaum in October 2005 during which Waldbaum said the killing was a drug rip-off and the shooter was Jeff Hoover. The district court instructed the jury after each series of questions that the statements could be used for the sole purpose of evaluating Waldbaum's credibility.

Waldbaum's statements, as introduced through Koziol, had the purpose of demonstrating that there was no real inconsistency between Waldbaum's earlier story and his trial testimony. In this circumstance, prior consistent statements may be admitted for rehabilitative purposes even if they are not admissible as substantive evidence under Rule 801(d)(1)(B). United States v. Kenyon, 397 F.3d 1071, 1081 (8th Cir. 2005).[2] The district court did not err in allowing the testimony.

---

[2]We are aware of the Supreme Court's determination that the rationale of Rule 801(d)(1)(B) is that testimony admitted under the rule is substantive evidence of rebutting an alleged motive. It is not to be used to bolster the veracity of the witness's story as told on direct examination. A prior consistent statement is not to be admitted simply to bolster a discredited witness or to counter all forms of impeachment, but is

The same holds true for McCaul's and Wilson's testimony. Kempton's statements that they recounted demonstrated the consistency of Kempton's testimony. The district court gave an appropriate limiting instruction and did not err in admitting the statements.

## III.

Hoover argues that the district court erred in giving the jury a cautionary instruction following the introduction of a statement from a deceased declarant. Hoover asserts that the testimony was important to his defense and that the district court gave no authority or reason to single out the evidence for special treatment. We review the district court's instructions to the jury for abuse of discretion. United States v. Milk, 281 F.3d 762, 768 (8th Cir. 2002).

Hoover sought to introduce a statement from James Davis, an individual who called the Lincoln Police Department on June 15, 1997, to say that he was a friend of Harold Fowler. Davis said he had spoken to Fowler on June 9. On June 10, Davis called Fowler to try to buy some marijuana from him. A male in his twenties, whom Davis believed to be African American, answered Fowler's telephone and said that Fowler wasn't there.

---

limited to the purposes cited by the rule. Tome, 513 U.S. at 157-58. In Tome, there was a "rather weak" allegation of fabrication that was countered with a barrage of sympathetic and credible witnesses who did no more than recount the witness's prior statements. The testimony was probative of the alleged conduct but shed minimal light on the fabrication motive. In its closing argument, the government spoke of the statements as substantive testimony and not to rebut the alleged motive. Id. at 165. In contrast, the statements in this case were limited to a series of a handful of questions to each witness, occupying a few pages of transcript out of eleven volumes.

Hoover urged the district court to admit Davis's statement under the residual exception to the hearsay rule. The district court expressed concern about the statement's reliability as Davis was not sworn and thus was not subject to the penalties of perjury, nor was he subject to cross-examination or available for the jury to use its normal measures of credibility. The district court gave Hoover's counsel the option of admitting the evidence with a cautionary instruction or denying its admission. Counsel chose the former, and the district court gave the instruction. The court told the jury that Davis had given Koziol his address, telephone number, date of birth, and had identified his race as black; that Hoover had established that a black man with a similar name and date of birth was dead; and that a black man with a similar name and date of birth had a record of alcohol-related misdemeanors. The court continued: "While you may consider this evidence and give such weight to the statement as you think it deserves, please do so with caution." The court then listed the three reliability concerns mentioned above.

Hoover's only complaint about the cautionary instruction is that the district court offered no authority or reason for it. In fact, the court provided three sound reasons why the jury should cautiously consider the evidence which, as it pointed out, would be admitted without limits for any purpose and could be given the weight the jury thought it deserved. The district court did not abuse its discretion.

## IV.

Finally, Hoover contends that the district court erred in entering a verdict on both counts of the superceding indictment because it alleged only one unit of prosecution and the two counts were redundant. In other words, Hoover is arguing that the indictment is multiplicitous because it charges a single offense in separate counts, a violation of the double jeopardy clause of the Fifth Amendment. See United States v. Platter, 514 F.3d 782, 785 (8th Cir. 2008). We review such a claim de novo. Id.

Hoover's claim is without merit. We have previously held that each separate use of a firearm in relation to a drug trafficking crime is punishable under 18 U.S.C. § 924(c) regardless of whether another charge under the same statute is related to the same predicate offense. United States v. Lucas, 932 F.2d 1210, 1223 (8th Cir. 1991). Moreover, under the test set forth in Blockburger v. United States, 284 U.S. 299, 304 (1932), Hoover is not subject to double jeopardy because each count requires proof of an element not required by the other. In Count I, the government had to prove that Hoover killed Harold Fowler. In Count II, the government had to prove that Hoover killed Duane Johnson. The district court did not err.

## V.

For the foregoing reasons, the judgment is AFFIRMED.

_____