UNITED STATES of America, Appellee,

v.

Candido ORTIZ–MARTINEZ, Appellant.

UNITED STATES of America, Appellee,

v.

Gabriel Jaime RAMIREZ–NAZAR, Appellant.

UNITED STATES of America, Appellee,

v.

Carlos FUENTEZ, also known as Carlos Fuentes, also known as Pupo, also known as Pupoo, Appellant.

UNITED STATES of America, Appellee,

v.

Stanley PRUITT, Appellant.

UNITED STATES of America, Appellee,

v.

Jorge RODRIGUEZ–CALDERON, also known as Koki, Appellant.

UNITED STATES of America, Appellee,

v.

Francisco SANTANA, Appellant.

Nos. 91–3856, 91–3858, 91–3866, 91–3872, 91–3873, 91–3875.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1992.

Decided July 23, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 7, 1993 in No. 91–3866.

Rehearing Denied Sept. 8, 1993 in No. 91–3858.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 8, 1993 in No. 91–3872.

---

Counsel who presented argument on behalf of the appellant Henry Robertson, St. Louis, MO, argued, for appellant Ramirez–Nazar.

John F. Medler, St. Louis, MO, argued, for appellant Fuentez.

Jane C. Hogan, St. Louis, MO, argued, for appellant Pruitt.

Rodolfo Rivera, St. Louis, MO, argued, for appellant Calderon.

Gloria Reno, St. Louis, MO, argued, for appellant Santana.

Daniel P. Reardon, Jr., Clayton, MO, on brief, for appellants.

Steven Holthousen, Asst. U.S. Atty., St. Louis, MO, argued, for appellee.

Before WOLLMAN, Circuit Judge, BRIGHT and HENLEY, Senior Circuit Judges.

WOLLMAN, Circuit Judge.

Candido Ortiz–Martinez, Gabriel Ramirez–Nazar, Carlos Fuentez, Jorge Rodriguez–Calderon, Stanley Pruitt, and Francisco Santana appeal from their convictions and sentences for drug-related offenses. We affirm.

## I.

In May 1989, following a series of events related to drug trafficking, the government began a multi-jurisdictional investigation of an extensive cocaine distribution network. The investigation involved cooperative efforts by the federal Drug Enforcement Administration (DEA), the St. Louis Metropolitan Police Department, the Internal Revenue Service, and various state and municipal police authorities throughout the United States.

The cocaine distribution network began in January 1988 and lasted until February 1990. The network was headquartered in Passaic and Patterson, New Jersey, and was managed and staffed by a closely-knit group of individuals, most of whom had immigrated from the Dominican Republic or were of Hispanic origin.

The government's investigation led to the conclusion that the conspiracy's "kingpin" was Francisco Santana. Santana, along with John Yazbek of Miami, was the primary organizer, manager and cocaine supplier of the network. Beginning in 1988, Santana began shipping cocaine from his base of operations in New Jersey to St. Louis, Missouri through a distribution network of couriers and middlemen, including appellants Gabriel Ramirez–Nazar and Jorge Rodriguez–Calderon. Ramirez, Rodriguez, and seven other middlemen in turn sold to twelve wholesale buyers in St. Louis, including Candido Ortiz–Martinez and Carlos Fuentez. The wholesale buyers in turn sold to a series of retail buyers, including Stanley Pruitt, who ultimately distributed the drugs to local purchasers and addicts in the St. Louis area. Santana's organization was responsible for the distribution of more than 100 kilograms of cocaine in the St. Louis area.

On February 9, 1990, a grand jury in the Eastern District of Missouri returned an indictment charging twenty-two individuals with various offenses related to the conspiracy to distribute cocaine. The conspiracy had included many other participants who had not been indicted at the time of trial, some of whom served as witnesses against their former colleagues. Of the twenty-two defendants, four remained fugitives at the time of the trial, one (Jose Hernandez) died awaiting trial, and eleven pled guilty before or during trial; the remaining six defendants, appellants herein, were tried and convicted of a variety of narcotics-related crimes.

The government's evidence at trial consisted of the testimony of law enforcement officials and numerous unindicted co-conspirators. In addition, the government provided the following physical evidence: the seizure of drug quantities; currency from drug proceeds; personal property obtained with drug proceeds; weapons; telephone toll records; bank records; and transcripts of undercover surveillance operations. The jury found each of the defendants guilty of conspiring to distribute and possess with the intent to distribute five or more kilograms of cocaine between January 1988 and February 1990. In addition, the jury found each defendant guilty on all additional counts charged. The district court sentenced the defendants to terms of imprisonment ranging from 188 months to 900 months.

## II.

We first examine issues raised by the individual appellants, followed by the two issues that are raised by more than one appellant, and conclude with sentencing issues.

### A. Francisco Santana

Santana was convicted of two offenses: (1) conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine between January 1988 and February 1990; and (2) attempted interstate travel to distribute drug proceeds in violation of 18 U.S.C. § 1952. The district court sentenced Santana to a total term of 600 months' imprisonment, to be followed by five years of supervised release.

Santana argues that the district court abused its discretion in denying his motion for a continuance based upon the illness of one of his attorneys, Worsham Caldwell. Santana also argues that the district court violated his Sixth Amendment right to effective assistance of counsel by requiring Caldwell's replacement, Richard Hughes, to complete the trial. We address these contentions in turn.

We have noted that "[a] trial judge has broad discretion in deciding whether to grant or deny a motion for a trial continuance." *United States v. Heine,* 920 F.2d 552, 555 (8th Cir.1990). " 'To determine whether the trial court has abused its discretion, the reviewing court will consider factors including counsel's time for preparation, conduct of counsel at trial and presence of prejudice in the record.' " *United States v. Bayless,* 940 F.2d 300, 302 (8th Cir.1991) (quoting *Nerison v. Solem,* 715 F.2d 415, 418 (8th Cir.1983), *cert. denied,* 464 U.S. 1072, 104 S.Ct. 983, 79 L.Ed.2d 220 (1984) and 465 U.S. 1026, 104 S.Ct. 1283, 79 L.Ed.2d 686 (1984)).

■ Santana was represented by the law firm of Shaw, Howlett and Knappenberger from February 1990 until November 9, 1990, when the Shaw firm withdrew and Santana replaced it with the law firm of Caldwell, Hughes, McHugh and Singleton. The entry of appearance was signed by Richard G. Hughes, and the District Court Clerk's Office directed all of its mailings to his attention during the case. Hughes also participated in lengthy and ultimately futile plea negotiations with the U.S. Attorney's office on Santana's behalf.

The trial began on August 12, 1991, with Caldwell acting as Santana's trial counsel. On Friday, August 23, Hughes informed the court that Caldwell had been forced to undergo surgery and requested a continuance of a week for him to prepare to substitute as Santana's trial counsel. The district court denied Hughes' motion and ruled that it would hold trial from August 26 through August 28, but agreed to continue the case from August 29, to resume five days later on September 3, 1991. On August 26, Madelyn Torres delivered testimony potentially damaging to Santana; however, the trial transcript demonstrates that Hughes skillfully cross-examined her. Moreover, Caldwell was in fact present and assisted Hughes on August 26. Caldwell was not present on August 28, but no testimony was offered on that date directly pertinent to Santana. When the trial resumed on September 3, both Hughes and Caldwell were present, as they were on every day thereafter. Indeed, with the exception of two days, Caldwell was present and available to assist Hughes in Santana's defense.

By requesting a continuance of one week, Hughes presumably believed that seven days would suffice to bring him up to speed on the case. Between August 23, when Hughes requested the continuance, and September 3, when he was rejoined by Caldwell, Hughes had, in fact, a total of seven days off. The only testimony during the intervening time period that directly incriminated Santana came from Marilyn Torres, and the record demonstrates that Hughes's cross-examination was skilled and thorough.

Santana next argues that the district court violated his Sixth Amendment right to effective assistance of counsel by requiring him to go forward with Hughes as counsel. To establish an ineffective assistance claim, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel's performance is deficient if "counsel's representation [falls] below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Counsel's performance prejudices an individual's defense if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Having reviewed the record, we find that Hughes' performance was not deficient within the meaning of the *Strickland* test.

Santana's arguments concerning his sentence are addressed below. We have considered Santana's remaining arguments, and we find that they are without merit.

## B. Candido Ortiz–Martinez

Candido Ortiz–Martinez was convicted of four offenses: (1) conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine between January 1988 and February 1990; (2) distributing cocaine in violation of 21 U.S.C. § 841; (3) using and carrying a firearm during a drug trafficking crime (conspiracy) on October 7, 1989, in violation of 18 U.S.C. § 924(c); and (4) using and carrying a firearm during a drug trafficking crime (conspiracy) on February 13, 1990, also in violation of 18 U.S.C. § 924(c). Ortiz was sentenced to a total term of 592 months' imprisonment, to be followed by five years of supervised release.

Ortiz initially argues that the district court erred in failing to grant his motion for a judgment of acquittal, because the evidence was insufficient to prove beyond a reasonable doubt that he committed the offense of conspiracy to distribute and possess with the intent to distribute more than five kilograms of cocaine.

■ In evaluating the sufficiency of the evidence supporting a jury verdict against a defendant, we review the evidence in the light most favorable to the government and give the government the benefit of all inferences that reasonably may be drawn from the evidence. *United States v. Drews,* 877 F.2d 10, 13 (8th Cir.1989).

■ Direct testimony by four witnesses, namely, Lisa Neeally, Larry Smith, Patricia Oliver, and Larry Birdsong implicated Ortiz in the sale and distribution of cocaine with co-defendants and other customers in the St. Louis area. One witness, Birdsong, even obtained tape-recorded conversations between himself and Ortiz, in which Ortiz candidly discussed the sale of a quarter kilogram of cocaine, eventually delivered by Jose Hernandez and Carlos Fuentez on Ortiz's behalf. In addition, the St. Louis police detained Ortiz at the St. Louis airport, where they seized $26,974 in cash from him. Last, he supplied the cocaine for purchases by Larry Birdsong on more than one occasion. Given this evidence, we cannot say that the verdict is unsupported by substantial evidence. *See*

*United States v. Bonadonna,* 775 F.2d 949, 958 (8th Cir.1985).

Ortiz does not challenge any aspect of his sentence in this appeal. We have considered Ortiz's remaining arguments, and we find that they are without merit.

## C. Gabriel Jaime Ramirez–Nazar

Gabriel Jaime Ramirez–Nazar was convicted of two offenses: (1) conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine between January 1988 and February 1990; and (2) distribution of more than 5 kilograms of cocaine on July 11, 1989, in violation of 21 U.S.C. § 841. Ramirez was sentenced to a total term of 188 months' imprisonment, to be followed by five years of supervised release.

Stanley Pruitt, Jorge Rodriguez, Larry Smith, and Carlos Fuentez wired $5,000 from St. Louis to Gabriel Ramirez in New Jersey in June 1989. Shortly thereafter, Smith was informed of the imminent arrival of ten kilograms of cocaine from Miami. On July 11, 1989, Ramirez arrived in St. Louis and distributed nine kilograms to Larry Smith, John Yazbek, and others. That night, police seized Ramirez's car and most of the cocaine and arrested both Yazbek and Ramirez in the motel room they were sharing.

Ramirez's sentencing claims are discussed below. We have considered Ramirez's other arguments, and we find that they are without merit.

## D. Carlos Fuentez

Carlos Fuentez was convicted of three offenses: (1) conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine between January 1988 and February 1990; (2) distributing cocaine on November 6, 1989, in violation of 21 U.S.C. § 841; and (3) using and carrying firearms during a drug trafficking crime (conspiracy) on May 18, 1989, in violation of 18 U.S.C. § 924(c). He was sentenced to a total term of 295 months' imprisonment, to be followed by five years of supervised release.

Fuentez served as a courier for the drug distribution network, transporting drugs and

cash between New Jersey and St. Louis. The government seized large amounts of currency from Fuentez on two occasions at the St. Louis airport.[1]

Fuentez argues that district court abused its discretion when it refused (1) to permit him to conduct an in-court demonstration of a narcotics detection dog examining U.S. currency; (2) to present expert testimony by a toxicologist concerning the percentage of U.S. currency that is contaminated by the odor of illegal narcotics, and (3) to authorize government payment for the toxicologist's services under 18 U.S.C. § 3006A(e)(1).

■ We have noted that the admissibility of experimental evidence is within the discretion of the trial court, and we will not overturn that decision absent a showing of an abuse of discretion. *Patterson v. F.W. Woolworth Co.*, 786 F.2d 874, 880 (8th Cir.1986); *Randall v. Warnaco, Inc.*, 677 F.2d 1226, 1233 (8th Cir.1982).

■ In refusing to allow the in-court demonstration with the narcotics detection dog, the court noted that the testimony would be irrelevant because the government had based its seizure of the currency on numerous factors other than the positive canine reaction. These had included the following facts: (1) Fuentez had paid for his ticket in cash; (2) he had appeared nervous; (3) he had purchased a one-way ticket; (4) he had one carry-on duffel bag and (5) he had given a thoroughly implausible explanation for having such a large amount of cash on his person. Consequently, we cannot say that the district court abused its discretion in refusing to allow the demonstration.

■ These arguments apply with equal force to Fuentez's request to present expert testimony concerning the level of drug contamination of currency. Fuentez's expert was prepared to testify that a substantial percentage of bills in the Miami area contain cocaine residue. Fuentez did not include in his offer of proof that the expert would testify (1) that a similar percentage of currency in St. Louis would be so contaminated; or (2) that the expert's analysis applied to all denominations. As before, a number of other factors went into the currency seizures that would render such testimony, even if true, irrelevant.

Last, we address Fuentez's argument that the district court committed reversible error by failing to authorize payment of his expert toxicologist under 18 U.S.C. § 3006A(e)(1). Because the district court did not err in refusing to permit the toxicologist to testify, it clearly did not err in refusing to authorize payment for such a witness. Moreover, the two cases cited by appellant in support of his position on this issue are distinguishable and involved a far greater showing of need on the defendant's part. *See United States v. Schultz*, 431 F.2d 907, 908–909 (8th Cir.1970) (need for medical experts to determine if defendant was competent to stand trial); *Brinkley v. United States*, 498 F.2d 505, 509–12 (8th Cir.1974) (need for independent psychiatrist to determine effects of LSD on defendant's brain to present insanity defense). As we noted in *Schultz*, "a trial court need not authorize an expenditure under subdivision (e) for a mere 'fishing expedition'." *Id.*, 431 F.2d at 911.

We address Fuentez' sentencing challenge below. We have considered Fuentez's remaining arguments, and we find that they are without merit.

**E.  Jorge Rodriguez–Calderon**

Jorge Rodriguez–Calderon was convicted of two offenses: (1) conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine between January 1988 and February 1990; and (2) engaging in

---

1.  On June 27, 1988, DEA Agents seized a total of $13,490 in U.S. currency from Fuentez at the St. Louis airport. Fuentez was travelling on a one-way ticket to Newark, New Jersey, under an assumed name. Fuentez told agents that a friend who owned a grocery store in New York had given him the cash to buy vegetables in St. Louis. A narcotics detection dog reacted positively to the currency.

On October 22, 1988, DEA Agents seized a total of $9,190 in U.S. currency from Fuentez at the St. Louis airport. The cash was sewn into the lining of a leather jacket. Fuentez again claimed that the currency had been given to him by his mysterious friend in New York, this time to buy a car which he, Fuentez, had been unable to locate. No claim was ever made for the return of the currency.

financial transactions involving drug proceeds on June 8, 1989, in violation of 18 U.S.C. § 1956. Rodriguez was sentenced to a total term of 262 months' imprisonment, to be followed by five years of supervised release.

All of Rodriguez' arguments pertain to sentencing and are discussed below.

**F. Stanley Pruitt**

Stanley Pruitt was convicted of seven offenses: (1) conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine between January 1988 and February 1990; (2) carrying and using firearms during a drug trafficking crime (conspiracy) on June 16, 1989, in violation of 18 U.S.C. § 924(c); (3) carrying and using firearms during a drug trafficking crime (conspiracy) on June 16, 1989, in violation of 18 U.S.C. § 924(c); (4) possession with intent to distribute more than 5 kilograms of cocaine on July 11, 1989, in violation of 21 U.S.C. § 841; (5) distribution of cocaine on November 17, 1989, in violation of 21 U.S.C. § 841; (6) possession with intent to distribute more than 500 grams of cocaine on November 17, 1989, in violation of 21 U.S.C. § 841; and (7) carrying and using a firearm during a drug trafficking crime (distribution and possession with intent to distribute more than 500 grams of cocaine) on November 17, 1989, in violation of 18 U.S.C. § 924(c).

Title 18, United States Code, § 924(c)(1) provides, in pertinent part:

Whoever, during and in relation to ... any drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years.... In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years.... Notwithstanding any other provision of law, ... the term of imprisonment imposed under this subsection [shall not] run concurrently with any other term of imprisonment[.]

Pruitt argues that he was improperly convicted of three separate violations of 18 U.S.C. § 924(c) and that he was improperly sentenced consecutively for each violation.

Beginning in March 1989, Stanley Pruitt became the primary retail dealer/customer in the conspiracy, in addition to directing the activities of various other dealers, including Larry Smith. Pruitt conducted his transactions at numerous locations in St. Louis.

On June 16, 1989, law enforcement authorities searched Pruitt's residence at 2201 Angelica. Pruitt and an associate, Frank Day, were present during the search. The authorities recovered automobile records, telephone numbers for members of the conspiracy, and $6,190 in U.S. currency from the residence. The authorities also seized numerous weapons from the first floor of the residence: (1) a .12 gauge shotgun; (2) a second .12 gauge shotgun with a sawed-off barrel; (3) an Arisaka bolt-action rifle; (4) a Marlin .35 caliber lever action rifle; (5) a .22 caliber revolver; and (6) a .25 caliber semiautomatic pistol.

On June 16, 1989, law enforcement authorities also searched the house at 5275 Beacon. The authorities recovered the following weapons from the front bedroom of the residence: (1) a .30 caliber semi-automatic machine pistol; and (2) a .22 caliber AR–7 rifle. The agents also seized various documents connecting Pruitt to the residence, including his driver's license permit, a number of pieces of mail addressed to him; and cash receipts in Pruitt's name.

The section 924(c) "use and carry" charge for November 17, 1989, originated in a separate incident. The St. Louis police department arrested one Donnie Davis late in the evening of November 16, 1989, in possession of a small quantity of cocaine. After his arrest, Davis identified his source of cocaine as Stanley Pruitt and agreed to arrange an additional purchase of cocaine from Pruitt. The police recorded a conversation between Davis and Pruitt in which Pruitt agreed to sell four ounces of cocaine to Davis and scheduled the transfer to occur at one of Pruitt's apartments at 9921B Sloane Square. After Davis had purchased five ounces of cocaine from Pruitt, the police arrested Pruitt as he exited the apartment building.

During a search of 9921B Sloane Square, police recovered a total of more than 600 grams of cocaine, assorted drug paraphernalia, and a .22 caliber rifle. A subsequent search by officers of Pruitt's residence at 4223 Marlin uncovered a .22 caliber revolver hidden in a hidden safe in a closet, along with other documentary evidence linking Pruitt to the conspiracy.

The principal witness to testify concerning Pruitt was Larry Smith, a lifetime acquaintance of Pruitt, who is currently in the Witness Protection Program. Smith testified that he was aware of weapons Pruitt kept at an apartment on Norstead Walk, at a house at 5275 Beacon, and at the Angelica Street residence. Smith explained that Pruitt used the weapons for protection in his narcotics dealings. On one occasion, Smith was present when Pruitt showed Smith, Ortiz, and Fuentez a weapon at 5275 Beacon and stated that "if somebody ran in there and wasn't supposed to be there, [Pruitt] was prepared for that."

As stated earlier, Pruitt was convicted of the following section 924(c) "use and carry" charges: (1) carrying and using firearms during a drug trafficking crime (conspiracy) on June 16, 1989; (2) carrying and using firearms during a drug trafficking crime (conspiracy) on June 16, 1989; (3) carrying and using a firearm during a drug trafficking crime (distribution and possession with intent to distribute more than 500 grams of cocaine) on November 17, 1989. Due to a number of previous offenses, Pruitt had a criminal history score of 11. The district court sentenced Pruitt to a total of 360 months' imprisonment for the drug offenses. With respect to the section 924(c) charges, the district court sentenced Pruitt to 60 months on the first charge, and 240 months consecutively on each of the second and third charges, for a total of 540 months.

Pruitt's appeal presents the following questions: (1) may a defendant be convicted of more than one violation of section 924(c) based upon the same predicate offense and, if so; (2) can a second violation of section 924(c) based upon the same predicate offense be considered a "second or subsequent" offense, allowing the court to impose consecu-

tive sentences for each offense and an enhanced twenty-year penalty for the second offense.

■ Pruitt first argues that he cannot be convicted of more than one offense within the meaning of 18 U.S.C. § 924(c) based upon the same predicate offense (conspiracy) for the two stashes of weapons that were found, respectively, in the first floor of his residence at 2201 Angelica and in the front bedroom of 5275 Beacon. We resolved this issue in *United States v. Freisinger,* 937 F.2d 383, 390 (8th Cir.1991), where we noted that "[w]e see no implication of the double jeopardy clause in multiple convictions for each separate possession of a firearm during and in relation to a single drug trafficking crime." *Id.* Accord, *United States v. Edwards,* 994 F.2d 417, 423 (8th Cir.1993). Accordingly, the district court properly convicted Pruitt on two section 924(c) charges based upon the two stashes of weapons recovered from 2201 Angelica and 5275 Beacon.

■ Having resolved that under *Freisinger* Pruitt may be convicted of three separate section 924(c) violations, we must now address a second question: once a defendant has properly been convicted of two section 924(c) violations based upon a single drug trafficking offense, is the second conviction a "second or subsequent" offense, permitting an enhanced and consecutively imposed twenty-year sentence?

In *United States v. Lucas,* 932 F.2d 1210 (8th Cir.1991), *cert. denied,* — U.S. —, —, —, —, 112 S.Ct. 199, 349, 399, 609, 116 L.Ed.2d 159, 288, 348, 632 (1991) and — U.S. —, 112 S.Ct. 1186, 117 L.Ed.2d 429 (1992), where the defendant had been convicted of the two section 924(c) charges based upon the same predicate offense, but entailing different uses, we found that "consecutive sentences on these counts do not violate the constitutional prohibition against double jeopardy." *Id.* at 1223. Although we reached a seemingly different result in *Freisinger,* the facts of that case distinguish it from Pruitt's situation. The defendant in *Freisinger* had been convicted of four separate section 924(c) violations based upon his carrying four weapons at the time police

arrested him in possession of cocaine. 937 F.2d at 385. We upheld the defendant's convictions on four separate section 924(c) violations based upon the same predicate offense. *Id.* at 390. In *Freisinger*, the district court had treated defendant's second, third, and fourth section 924(c) violation as "second or subsequent offenses" for the purposes of the statute, and imposed consecutive sentences for each count. *Id.* at 385. We concluded that "when a defendant has been convicted of more than one violation of section 924(c) because he was carrying more than one firearm during a single drug trafficking offense, the convictions after the first one are not 'second or subsequent' convictions within the meaning of the statute." *Id.* at 391. Thus, in *Freisinger* we reasoned that the proper solution involved: (1) sentencing the defendant to a term corresponding to a first offense under section 924(c) for each violation based upon the same predicate offense; and (2) imposing those sentences to run concurrently.

There is, however, a crucial difference between *Freisinger* and *Lucas*. In *Lucas*, the defendant was sentenced to consecutive terms based upon the two separate stashes of weapons. In *Freisinger*, by contrast, concurrent sentences were appropriate because the defendant had been convicted separately for each of the four weapons found in a single stash.

Moreover, the Supreme Court's recent opinion in *Deal v. United States*, — U.S. ——, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), confirms that the district court may sentence a defendant to a consecutive twenty-year term under 18 U.S.C. § 924(c) for "a second or subsequent conviction" where both the first and any subsequent convictions arise in the same proceeding.

Accordingly, the district court properly sentenced Pruitt to five years on the first section 924(c) conviction, and to consecutive twenty-year terms for his second and third section 924(c) convictions.

### III.

A number of the appellants argue the following two issues on appeal: (1) that the government improperly used a peremptory challenge to strike the only black juror from the jury panel in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and (2) that the district court erroneously admitted the hearsay testimony of four witnesses as co-conspirator admissions under Federal Rule of Evidence 801(d)(2)(E).

### A. *Batson* Issue

Appellants Santana, Ortiz, Ramirez, Fuentez, and Pruitt argue that the government's exercise of one of its peremptory strikes against juror # 1 was racially discriminatory and violated their equal protection rights under *Batson*.

In *Batson*, the Supreme Court held that the Equal Protection clause forbids the government from challenging potential jurors solely on account of their race. *Id.* at 89, 106 S.Ct. at 1719. *See United States v. Thomas*, 914 F.2d 139, 142 (8th Cir.1990). Under *Batson*, once a defendant makes a prima facie case of the prosecution's purposefully discriminatory use of peremptory challenges, the burden shifts to the government to come forward with a neutral explanation, particular to the case, for striking jurors of the defendant's race. *Thomas*, 914 F.2d at 142. We review a district court's finding that the government has exercised its peremptory challenges in a nondiscriminatory manner under the clearly erroneous standard. *Id.*

Six jurors (numbered respectively 1, 12, 17, 36, 39, and 49) were black and juror # 47 was Hispanic. The eventual jury of twelve persons was chosen from the first thirty-one members, thus automatically eliminating jurors numbered 36, 39, 47, and 49. The district court struck jurors numbered 12 and 17 for cause, leaving juror # 1 as the only black or Hispanic juror available to sit on this case. The government used one of its peremptories to strike juror # 1. The defense made a proper *Batson* exception. In response to the district court's request for a statement of reasons, the government stated that juror # 1 had testified as a witness in a case in which her sister had been a criminal defendant. Moreover, when asked whether that experience would affect her impartiality

in the upcoming trial, juror #1 replied equivocally, "No, I don't think so." Accordingly, the district court found that the government's reason was a valid, race-neutral justification.

■ Appellants argue that the inclusion of juror #14, who was white and who admitted during voir dire to having a friend who had recently been prosecuted for bribery in federal court, supports their *Batson* claim. Significant differences exist, however, between the experiences of juror #1 and juror #14. Juror #14 had not been a witness at his friend's trial, the trial did not involve a close family member, and juror #14 admitted that he did not know the details of the bribery case. Moreover, when asked if that experience would affect his ability to impartially hear this trial, he replied unequivocally, "No."

Consequently, we find no clear error here. The prosecution's reasons for striking the black juror were unique to the facts of the case and were racially neutral, and thus constitutionally permissible. *See Thomas,* 914 F.2d at 142.

## B. Co–Conspirator Hearsay Issue

Santana, Ramirez–Nazar, Fuentez, and Pruitt jointly argue that the district court erred in admitting the hearsay testimony of four witnesses as co-conspirator admissions under Federal Rule of Evidence 801(d)(2)(E).

Under the federal rules, a statement is not hearsay if made "by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). To satisfy the requirements of Rule 801(d)(2)(E), " 'the government must demonstrate that (1) a conspiracy existed; (2) that the defendant and declarant were part of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy.' " *United States v. Kocher,* 948 F.2d 483, 485 (8th Cir.1991) (quoting *United States v. Eisenberg,* 807 F.2d 1446, 1453 (8th Cir.1986)).

■ Under the approach used in this circuit, first set forth in *United States v. Bell,* 573 F.2d 1040 (8th Cir.1978), a district court is required to admit conditionally the state-

ments of alleged co-conspirators, subject to an on-the-record ruling that the statement is admissible under the co-conspirator exception to the rule against hearsay. *United States v. Coco,* 926 F.2d 759, 761 (8th Cir. 1991). Where the record indicates that the defendant failed to request a *Bell* ruling but made a motion for acquittal, we treat the district judge's denial of the acquittal motion as substantial compliance with the *Bell* requirements, infer the requisite *Bell* findings, and employ a plain-error standard of review. *See Id.*

Appellants first challenge the admissibility of the testimony of Daniel Perkins concerning Perkins's contact with Stanley Pruitt during November 1989, when Perkins installed several hidden safes in Pruitt's residence at 4223 Marlin Court. Contrary to the appellants' contention, Perkins related no hearsay statements in the course of his testimony, but testified only as to his first-hand observations. Perkins testified that, while at that address, he personally observed Pruitt consummate several transactions that involved measuring white powder on a triple beam scale. Although Perkins testified that these visitors had spoken to Pruitt, he did not relate the substance of any of these conversations. Consequently, Perkins provided no testimony that would offend Fed.R.Evid. 801(d)(2)(E).

■ Next, appellants challenge two portions of Madelyn Torres's testimony concerning events that occurred in her apartment during the spring of 1989, when she was dating Frank Santana. Torres testified that on at least two occasions Santana had received Ruben Santana, Francisco Herrera, Jose Hernandez, and Candido Polanco in her apartment. Torres testified that on both occasions the visitors delivered shoe boxes full of currency to Frank Santana and had stated that "... this is the money from the one eighth, or, you know, whatever material they had sold," using terms associated with fractional amounts of cocaine.

We find that Torres' statements satisfy the requirements set forth in *Kocher* for admissibility under Fed.R.Evid. 801(d)(2)(E). Independent evidence demonstrated that Ruben

Santana, Herrera, Hernandez and Polanco were all involved in the conspiracy. Moreover, as the visitors were primarily involved in handling the financial aspects of the venture, the statements concerning the shoeboxes described the source of the money, and thus were in furtherance of the conspiracy.

■ Next, the appellants challenge several aspects of Felix Gil's testimony. Felix Gil was an illegal alien from the Dominican Republic who served as one of Santana's money couriers and testified for the prosecution. Gil is currently in the Witness Security Program. First, the appellants challenge Gil's testimony concerning conversations he had with Jose Hernandez, Candido Polanco, Eduardo Cedeno, and Francisco Herrera concerning the operation of the conspiracy. The majority of this testimony concerned conversations between Gil and Herrera concerning Santana's operation in St. Louis, its members, and its activities. Herrera, Frank Santana's nephew, was a central player in the conspiracy. Gil's conversations with Herrera satisfy the requirements of Fed. Rule Evid. 801(d)(2)(E) because Herrera was a member of the conspiracy and entered into the conversations in furtherance of the conspiracy to successfully recruit Gil to become one of Santana's money couriers.

The appellants also challenge Gil's testimony regarding Santana's source of income. In his direct examination, Gil testified that he had learned that Santana's primary source of income was drugs from "the guys that used to sell" for Santana. The government admits on appeal that such testimony was probably inadmissible due to a lack of specificity concerning the identity of the speaker. Gil backed this statement up, however, by noting that his own observation had led him to the same conclusion, namely, that Santana's principal source of income was drug-related. Because counsel failed to request a *Bell* finding, we infer the *Bell* finding from the judge's denial of Santana's motion for acquittal on September 17, 1991, and review for plain error. Given this subsequent additional testimony, we find that any error in admitting the earlier testimony was harmless.

■ Appellants also challenge Gil's testimony concerning Santana's alleged owner-ship of two New Jersey bars. Gil testified that various persons had told him that Santana owned two bars, but could not be more specific about the identity of these persons. Any error in admitting this testimony, however, was harmless, given its corroboration from independent sources. Moreover, Madelyn Torres testified that Santana personally told her that he owned two New Jersey bars, the "Copacabana" and "The Colombia House." Indeed, a search of the Copacabana by authorities on September 9, 1988 recovered Santana's personal identification documents, including his social security card, from a safe under the bar of the club. In addition, the ownership of these bars was a peripheral issue in the case.

■ Last, the appellants object to Sergeant Mario Recino's testimony in which he related a conversation with a female identified as Brenda, who gave him Santana's nickname and beeper number. Recino used the beeper number to contact Santana, discussed with him the purchase of multiple kilograms of cocaine, and also learned directly from Santana that Santana was selling kilogram quantities of cocaine in both New Jersey and St. Louis. Brenda's statements incriminate no one other than Santana, and the statements clearly had the purpose of furthering Santana's drug distribution enterprise by putting him in contact with a potential customer. Moreover, other evidence established that the nickname and beeper number belonged to Santana. Last, because the record reveals that counsel failed to request a *Bell* finding, we infer the *Bell* finding from the judge's denial of Santana's motion for acquittal on September 17, 1991, and review for plain error. Given this subsequent additional testimony, any error in admitting the earlier testimony was harmless.

### IV.

Last, appellants make the following arguments with respect to the sentences imposed by the district court.

**A. Attribution of Cocaine Amounts to Rodriguez, Ramirez & Fuentez under U.S.S.G. § 1B1.3(a)(1).**

■ Appellants Fuentez, Ramirez–Nazar, and Rodriguez–Calderon argue that the dis-

trict court erroneously attributed an excessive amount of cocaine to them in determining their base offense levels. The court computed the base offense level for these three defendants to be 36, based on a finding that the conspiracy involved between 50 and 150 kilograms of cocaine.

We set forth the standards for determining drug quantities attributable to individual defendants in a conspiracy in *United States v. Olderbak,* 961 F.2d 756 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 422, 121 L.Ed.2d 344 (1992). We noted that:

> Under subsection (a) of Section 1B1.3 of the Sentencing Guidelines, each conspirator is responsible for all criminal acts committed in furtherance of the conspiracy. '[S]uch conduct is *not* included in establishing the defendant's offense level,' however, if it 'was neither within the scope of the defendant's agreement nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake.' "

*Id.* at 764 (citations omitted) (emphasis in original). A district court's determination of the quantity attributable to an individual defendant for sentencing purposes "is a factual determination subject to review under the clearly erroneous standard." *Id.* at 763.

In ascertaining the amount of drugs involved in the conspiracy, the district court adopted the conclusion of the presentence investigation reports that "[i]n total, the drug distribution organization headed by Santana was responsible for the distribution of over 105 kilograms of cocaine in the St. Louis area." The U.S. Probation Office obtained an amount of greater than 50 kilograms by two independent methods. First, the authorities arrived at the 105 kilogram figure by totalling amounts derived from the testimony of witnesses and corroborating evidence in the case. Second, U.S. law enforcement officers seized approximately 13.5 kilograms of cocaine. Additionally, officers seized $545,-552.00 in U.S. currency and checks. Last, the organization transferred approximately $400,000 by wire. The amount of drug proceeds totaled roughly $945,000, which, when divided by an average cost of $23,000 per kilogram, represents 41 kilograms of cocaine,

which, when added in turn to the 13.5 kilograms actually seized, totals over 50 kilograms. We have previously endorsed the extrapolation of drug quantities from similar financial information. *See United States v. Carper,* 942 F.2d 1298, 1303 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 614, 116 L.Ed.2d 636 (1991). We do not find the calculation of drug quantities to be clearly erroneous here.

■ The district court found that the entire amount of cocaine distributed by the conspiracy in this case was reasonably foreseeable to Fuentez. We agree. Substantial evidence showed that he was personally involved in the conspiracy from beginning to end. Fuentez began working as a worker and money courier for co-defendant Taurino Gonzalez–Felix during the summer and fall of 1988, which included the attempted delivery of $40,000 to Frank Santana in August 1988. Fuentez was directly implicated in the conspiracy by the testimony of Lisa Neeally, Patricia Oliver, Lissette Jacquez, Larry Smith, and Larry Birdsong.

Moreover, Fuentez figured prominently in several of the law enforcement events involved in the conspiracy. As discussed earlier, law enforcement officers seized a total of $22,680 in currency from Fuentez on two separate occasions at the St. Louis airport in the summer and fall of 1988. Fuentez was also present in an apartment on October 7, 1989, where police arrested Candido Ortiz and recovered a bag containing cocaine. Likewise, Fuentez was arrested after he, along with Ortiz and Jose Hernandez, sold an undercover officer and a police informant a quarter kilogram of cocaine for $7,000 on November 6, 1989. Last, when law enforcement officials stopped Fuentez at the St. Louis airport for a third time on December 21, 1989, papers confiscated from Fuentez contained the beeper number of Frank Santana.

The district court found that the entire amount of cocaine in the conspiracy was also attributable to Gabriel Ramirez–Nazar. As with Fuentez, the evidence demonstrated that Ramirez played an important role in the conspiracy. Ramirez worked as a courier/middleman for Santana, and worked close-

ly with co-defendant Rodriguez. On June 8, 1989, Ramirez received $5000 from Larry Smith, wired to him at the direction of Rodriguez–Calderon. One month later, Ramirez delivered a vehicle containing nine kilograms of cocaine to Stanley Pruitt in St. Louis. Authorities arrested Ramirez shortly thereafter, at which time he was sharing a room with ringleader John Yazbek. Ramirez made a false exculpatory statement to police shortly after his arrest on July 11, 1989. At that time, police recovered from Ramirez a document indicating that he was the joint owner of an automobile with Yazbek. Additionally, testimony by both Felix Gil and Madelyn Torres linked Ramirez to Frank Santana, John Yazbek, and other members of the conspiracy. ·Last, at the time of Santana's arrest, authorities recovered from him an address book containing the name and telephone number of Gabriel Ramirez under his nickname, "pela cuca." The evidence showed that Ramirez and Rodriguez worked closely together.

Although Ramirez is not directly implicated in any law enforcement events other than those surrounding the delivery of nine kilograms of cocaine, strong circumstantial evidence, both documentary and testimonial, indicate his willing participation in the full extent of the conspiracy. The conspiracy's leaders plainly believed Ramirez worthy of sufficient trust to handle nine kilograms of cocaine, which, at a value of approximately $23,000 per kilogram, is worth $207,000, an amount that contradicts Ramirez's assertion that he was a minor participant. Given the district's opportunity to hear the testimony and ascertain the credibility of the numerous witnesses in this case, we cannot say that it clearly erred in attributing to Ramirez the total amount of the cocaine involved in the conspiracy.

Jorge Rodriguez–Calderon also argues that the district court erred in attributing to him the entire amount of cocaine distributed over the course of the conspiracy.

The government presented substantial evidence establishing that Rodriguez played an important role in the ·conspiracy. Rodriguez directed Larry Smith to wire Ramirez $5,000 to pay off cocaine debts to the New Jersey operation, thereby opening the door to future shipments to the St. Louis area. The government introduced evidence that, as a result of this wire, Ramirez drove a car containing nine kilograms of cocaine. to St. Louis. When Rodriguez came to St. Louis in June 1989, he came in a supervisory capacity to, as one of the witnesses put it, "straighten everything up." As the government later explained, "straightening everything up" consisted of collecting money to correct prior losses in the trans-continental drug enterprise. While in St. Louis, Rodriguez managed the dealing and distribution aspects of many members of the conspiracy, including Carlos Clausen and Jose Cintron. In addition, Madelyn Torres testified that Rodriguez had given instructions to both her and Delisa Cordero to deliver three kilograms of cocaine to St. Louis in mid-July 1989. In conversations with Larry Smith, Carlos Clausen referred to Rodriguez as the "big boss." As with Ramirez, Rodriguez's involvement in personally arranging the delivery of nine kilograms of cocaine and acting in a managerial capacity with respect to the enterprise's St. Louis contacts demonstrates his central role in the conspiracy. In the light of this evidence, we cannot say that the district court clearly erred in attributing to Rodriguez the amount of cocaine that it did. *See Bonadonna,* 775 F.2d at 958.

**B. Santana and Rodriguez's Challenge to the Enhancement of their Sentences under U.S.S.G. § 3B1.1.**

Santana and Rodriguez also challenge the district court's enhancement of their offense levels pursuant to U.S.S.G. § 3B1.1 for their aggravating roles in the offense.[2] The dis-

**2.** Section 3B1.1 provides, in pertinent part: Based on the defendant's role in the offense, increase the offense level as follows:
(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

trict court enhanced Santana's offense level by four levels because he was as an organizer or leader of a criminal activity involving five or more participants or that was otherwise extensive. Similarly, the district court enhanced Rodriguez' offense level by three levels for being a manager or supervisor in a criminal activity involving five or more participants or that was otherwise extensive.

■ In making a determination under U.S.S.G. § 3B1.1, the sentencing court should consider such factors as the nature of defendant's role in the offense, the recruitment of accomplices, the degree of participation in planning or organizing the offense. U.S.S.G. § 3B1.1, comment. (n. 3); *United States v. Roberts*, 953 F.2d 351, 354 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 3008, 120 L.Ed.2d 882 (1992). A finding by the district court under U.S.S.G. § 3B1.1 is a factual determination that we review under the clearly erroneous standard. *United States v. Wiegers*, 919 F.2d 76, 77 (8th Cir. 1990).

We have broadly defined the term "organizer" or "leader." *United States v. Manuel*, 912 F.2d 204, 207 (8th Cir.1990). In addition, we have noted that an individual can occupy a leadership role without having directly controlled his co-conspirators. *United States v. Grady*, 972 F.2d 889, 889 (8th Cir.1992).

■ The district court's decision to increase Santana's offense level by four was not clearly erroneous. Santana was the leader of this entire conspiracy. He was the conspiracy's principal supplier, and he was involved in the conspiracy from August 1988 until his arrest in February 1990. For the duration of the conspiracy, a vast amount of money, estimated by law enforcement authorities to be nearly $1,000,000, was sent by other conspirators directly to Santana or via his relatives. Santana's beeper served as the common link among all the conspirators. The evidence supported the inference that Santana directed the activities of Jose Hernandez, Candido Polanco, Eduardo Cedeno, and Felix Gil. Gil testified that Santana had recruited him into the conspiracy and had directed him to transport $56,000 in cash to St. Louis in December 1989. Gil and Madelyn Torres both confirmed during their testimony that Santana was the ringleader of this conspiracy. Moreover, in July 1989, Santana represented himself to Sergeant Recino as the leader of the conspiracy and boasted about the profit opportunities present in St. Louis. Given the facts recounted during testimony, the district court's enhancement of Santana's offense level by four was not clearly erroneous.

■ Likewise, we cannot say the district court clearly erred in enhancing the offense level of Jorge Rodriguez–Calderon. Rodriguez, as recounted earlier, played a significant role in the management of the conspiracy. He was referred to as the "big boss" and was dispatched to St. Louis to "straighten everything up" and await Ramirez' nine kilogram cocaine shipment. Thus, the evidence supports the district court's finding that Rodriguez was a manager or supervisor within the meaning of U.S.S.G. § 3B1.1(b).

**C. Fuentez, Ramirez, and Rodriguez's Challenge to the District Court's Refusal to Reduce their Offense Levels under U.S.S.G. § 3B1.2(b).**

■ Fuentez, Ramirez, and Rodriguez claim that the district court erred in refusing to reduce their offense levels as minor or minimal participants under U.S.S.G. § 3B1.2(b). A district court's refusal to grant such a reduction is a finding of fact that we review under the clearly erroneous standard. *United States v. Regan*, 940 F.2d 1134, 1136 (8th Cir.1991).

■ To be a minimal participant, the particular defendant must have been "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, comment. (n. 1). The Application Notes to section 3B1.2 state that courts should use the "minimal participant" exception "infrequently," possibly in cases where "an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." U.S.S.G. § 3B1.2, comment. (n. 2). Given their extensive participation in the enterprise, any argument that Fuentez, Ramirez, or Rodriguez qualify for this exception is without merit.

To be a minor participant, the particular defendant must have been "less culpable than most other participants." U.S.S.G. § 3B1.2, comment (n. 3). Fuentez's extensive participation in the conspiracy was discussed earlier and precludes serious consideration of his request. Likewise, Rodriguez's role as a manager and one who directed the activities of other conspirators precludes his success in this argument. Finally, we cannot say the district court's refusal to grant Ramirez a reduction under section 3B1.2 was clearly erroneous.

We have examined appellants' other arguments and we find them to be without merit.

Accordingly, we affirm the convictions and sentences of the appellants.

BRIGHT, Senior Circuit Judge, concurring separately.

I write separately to comment on the forty-five-year addition to Stanley Pruitt's sentence, premised upon an interpretation of 18 U.S.C. § 924(c)(1).

Pruitt, a retail buyer of drugs in the conspiracy, received a sentence of seventy-five years (900 months), twenty-five years longer than the sentence of Frank Santana, the supplier of the drugs and leader of the conspiracy. Under the 18 U.S.C. § 924(c)(1) provision for "second or subsequent" firearm offenses, the sentencing court added forty-five years to Pruitt's sentence of thirty years; an additional five years for the first firearm offense, and an additional twenty years for each "second or subsequent" offense.

The majority relies on *United States v. Lucas,* 932 F.2d 1210 (8th Cir.1991), *cert. denied,* —— U.S. ——, ——, ——, ——, 112 S.Ct. 199, 349, 399, 609, 116 L.Ed.2d 159, 288, 348, 632 (1991) and —— U.S. ——, 112 S.Ct. 1186, 117 L.Ed.2d 429 (1992), to support imposing consecutive sentences. *Lucas* holds that defendants may receive consecutive sentences under § 924(c) for the same predicate offense when the firearms are used for different purposes. *Id.* at 1223. The opinion states that the policy behind this interpretation is to "persuade the man who is tempted to commit a federal felony to leave his gun at home." *Id.* (citing *United States*

*v. Rawlings,* 821 F.2d 1543, 1546 (11th Cir. 1987) (quoting Representative Poff at 114 Cong.Rec. 22231 (1968))). It fails to explain how draconian sentences for repeat offenders will deter a previously unconvicted, and perhaps uncharged, firearm offender.

I disagree with the rationale authorizing pyramiding of sentences for firearm violations without prior convictions underlying *Lucas* and the earlier case of *United States v. Foote,* 898 F.2d 659, 668 (8th Cir.), *cert. denied,* 498 U.S. 838, 938, 111 S.Ct. 112, 342, 112 L.Ed.2d 81, 307 (1990), and believe those cases misinterpret § 924(c). I will not reiterate my position, which is elaborated in *United States v. Jones,* 965 F.2d 1507, 1519–21 (8th Cir.), *cert. denied,* —— U.S. ——, ——, 113 S.Ct. 346, 439, 121 L.Ed.2d 261, 358 (1992).

Recently, the majority of the Supreme Court rejected the reasoning expounded in *Jones. Deal v. United States,* —— U.S. ——, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993). I am bound to accept its ruling as binding legal precedent in sentencing Pruitt. Nevertheless, the Court's interpretation of § 924(c) leads to draconian sentences perhaps unintended by the lawmakers. Congress should review and reconsider the language of the statute. It may conclude, as does the dissent in *Deal,* that the language of the statute relating to enhancement of sentences should be "applied to defendants who, having once been convicted under § 924(c), 'failed to learn their lessons from the initial punishment' and committed a repeat offense." *Id.* at ——, 113 S.Ct. at 2003 (quoting *United States v. Neal,* 976 F.2d 601, 603 (9th Cir. 1992) (Fletcher, J., dissenting)). I urge Congress to ponder the following comment from *Jones,* echoed by Justice Stevens in his dissent:

'However, punishing first offenders with twenty-five-year sentences does not deter crime as much as it ruins lives. If, after arrest and conviction, a first offender is warned that he will face a mandatory twenty-year sentence if he commits the same crime again, then the offender will know of the penalty. Having already served at least five years in prison, he will have a strong incentive to stay out of

trouble. Discouraging recidivism by people who have already been in prison and been released serves a far more valuable purpose than deterring offenders who have yet to be arrested and have no knowledge of the law's penalties.'

*Deal,* —— U.S. at ——, 113 S.Ct. at 2003 n. 10 (quoting *United States v. Jones,* 965 F.2d 1507, 1521 (8th Cir.1992) (internal citation omitted)).